```
                     COURT  OF  COMMON  PLEAS

                     HAMILTON  COUNTY,  OHIO



 -------------------------------)
                                )
 STATE OF OHIO,                 )
                                )
             Plaintiff,         )
                                )
        vs.                     )       Case No.
                                )       B-9705067
 DAVID NEELEY,                  )
                                )
             Defendant          )       O R I G I N A L
                                )
 -------------------------------)
```

1
2
3
4
5
6
7
8
9
10
11

12    DEPOSITION OF:        JOHN E. GERBER, MD

13    TAKEN:                By the Plaintiff

14    DATE:                 November 24, 1999

15    TIME:                 Commencing at 1:30 p.m.

16    PLACE:                Offices of:
                            Prosecuting Attorney
17                          Hamilton County
                            Suite 4000
18                          230 East Ninth Street
                            Cincinnati, Ohio  45202
19

20    BEFORE:               BARBARA A. THACKER, RPR
                            Notary Public - State of Ohio

21
22
23
24

137

```
 1   APPEARANCES:

 2           On behalf of the Plaintiff:

 3                   SETH S. TIEGER, ESQ.  and
                     BRADLEY J. GREENBERG, ESQ.
 4                        of
                     Prosecuting Attorney
 5                   Hamilton County
                     Suite 4000
 6                   230 East Ninth Street
                     Cincinnati, Ohio  45202
 7

 8           On behalf of the Defendant:

 9                   PERRY L. ANCONA, ESQ.
                          of
10                   Perry L. Ancona Co., LPA
                     1300 American Building
11                   30 East Central Parkway
                     Cincinnati, Ohio  45202
12

13                   S T I P U L A T I O N S

14

15           It is stipulated by and between counsel for the

16   respective parties that the deposition of JOHN E. GERBER,

17   MD, a witness herein, may be taken at this time by Counsel

18   for the Plaintiff as upon cross-examination and pursuant to

19   the Ohio Rules of Civil Procedure; that the deposition may

20   be taken in stenotype by the notary public-court reporter

21   and transcribed by her out of the presence of the witness;

22   that the transcribed deposition is not to be submitted to

23   the witness for his examination and that signature is

24   waived.
```

```
1                    I N D E X

2

3   JOHN E. GERBER, MD                              PAGE

4       DIRECT EXAMINATION BY MR. TIEGER              4

5       CROSS-EXAMINATION BY MR. ANCONA              41

6       REDIRECT EXAMINATION BY MR. TIEGER           65

7       RECROSS-EXAMINATION BY MR. ANCONA            66

8

9                    EXHIBITS

10  STATE'S EXHIBIT NUMBER                          PAGE

11  #1.   Photograph of Scene                        38

12  #2.   Photograph of Scene                        38

13  #3.   Photograph at Morgue                       39

14  #4.   Photograph at Scene                        39

15  #5.   Photograph of Clothing                     39

16  #6.   Photograph of Clothing                     39

17  #7.   Photograph of Injuries                     40

18  #8.   Photograph of Injuries                     40

19  #9.   Photograph of Injuries                     40

20  #10.  Photograph of Injuries                     40

21  #11.  Photograph of Injuries                     40

22

23

24
```

1                    JOHN E. GERBER, MD

2  of lawful age, a witness herein, being first duly affirmed

3  as hereinafter certified, was examined and deposed as

4  follows:

5                    DIRECT EXAMINATION

6  BY MR. TIEGER:

7      Q.   Ladies and gentlemen, we're here with Dr. Gerber,

8  it's Wednesday, November 24, around 1:30 in the afternoon.

9  Present are defense counsel, as well as Mr. Greenberg, and

10 we're here to take the deposition of Dr. Gerber who was the

11 coroner on the Judy Smith case.  He is unavailable to

12 testify, is that correct, Doctor, during the time this

13 trial is going to be held?

14     A.   Yes.

15     Q.   Would you please state your name and spell your

16 last name?

17     A.   John, J-O-H-N, E. Gerber, G-E-R-B-E-R,

18 medical doctor.

19     Q.   And what's your occupation, Dr. Gerber?

20     A.   I am a forensic medical examiner in Nashville,

21 Tennessee at the Metropolitan County of Davidson in

22 Nashville and I work for a private firm called Forensic

23 Medical, which contracts to the Metropolitan County for

24 forensic services.

1    Q.    Is that in Nashville, Tennessee?

2    A.    It is.

3    Q.    And because your duties in Nashville, Tennessee

4    the last week of November, the week of the 29th, and the

5    first week of December, I think it's December 6, that

6    Monday, you would be unavailable to come to court for those

7    two weeks; is that correct?

8    A.    That's correct.

9    Q.    And you have been nice enough to fly up to

10    Cincinnati to be deposed today, the Wednesday before

11    Thanksgiving?

12    A.    Yes.

13    Q.    What was your occupation in May of 19 -- May and

14    June of 1994?

15    A.    I was one of the Assistant Medical Examiners at

16    the Hamilton County Coroner's Office in Cincinnati, Ohio.

17    Q.    Dr. Gerber, could you go through for the ladies

18    and gentlemen of the jury your educational background?

19    A.    Briefly, beginning with graduation from medical

20    school, which occurred in June of 1974, I graduated from

21    Tufts University in Boston.  After that I did internship

22    and a complete four year residency program in all aspects

23    of pathology at the University of Vermont and finished that

24    in 1979.  After that I became board qualified in both

1   anatomic and clinical pathology.  For a number of years I

2   practiced hospital pathology.

3          In 1992 I did a fellowship in forensic pathology

4   at the University of Pennsylvania in Philadelphia at the

5   Medical Examiner's office and subsequently became board

6   certified in forensic pathology after that training period.

7          I came here in 1993 to Cincinnati, Ohio, and

8   practiced for four years as a medical examiner until I

9   moved to Nashville, Tennessee in 1997.

10  Q.    I forgot to say that Mrs. Thacker was here from

11  Judge Niehaus' room taking a transcript of all your

12  testimony, Dr. Gerber, but she's present in the room as

13  well.

14  A.    Yes.

15  Q.    Back in May and June of 1994, were you licensed to

16  practice medicine in the State of Ohio?

17  A.    I was.

18  Q.    And you're now licensed in the State of Tennessee?

19  A.    That's correct.

20  Q.    Could you describe, Dr. Gerber, to the ladies and

21  gentlemen of the jury what is a pathologist?

22  A.    Since we are dealing with autopsy pathology I'll

23  confine my comments to strictly that area of pathology.

24  It's an examination of a person who is deceased from head

1    to toe.  And as I'm demonstrating on myself, would be to

2    the top and look all the way down to the toes and the feet,

3    including clothing, if that's appropriate, and look at the

4    outside of the body first, after which we take the clothes

5    off, do a "Y" shaped incision, like I'm making on myself,

6    or demonstrating on myself, reflect back the chest plate

7    and the soft tissue and then look at the internal organs.

8         Then the head is examined simply by cutting across

9    to both sides of the ear and reflecting the scalp forward

10   and backward and then taking the top of the skull off with

11   a saw and removing that, and then looking at the brain and

12   taking that out.

13   Q.   And you've talked about what a pathologist does.

14   Did part of your answer encompass what an autopsy actually

15   is?

16   A.   Yes, I was really describing autopsy and the kind

17   of work we do is, looks at sudden unexpected death, whether

18   it's a homicide, killed by somebody else; suicide, killed

19   by the person themselves; an accident, whether that's

20   industrial or motor vehicle accident, or a natural death

21   such as a heart disease.

22   Q.   So when you're examining a body you're looking at

23   the different manners that death could have occurred,

24   either accident, suicide, natural or homicide?

1    A.    That's correct.

2    Q.    And I'm going to -- have you performed -- I don't

3    know if you have got an estimate, Doctor, of how many

4    autopsies you've performed but do you have an idea of how

5    many you've done?

6    A.    Yes, over 2,000.

7    Q.    I'm going to direct your attention now to June 1

8    of 1994, in the early afternoon hours of that day,

9    somewhere around 1:30 or so in the afternoon and ask you if

10   you responded to an area in lower Millcrest Park?

11   A.    Yes, I did.

12   Q.    And did you occasionally respond to murder scenes

13   when you were a coroner?

14   A.    Yes.  We did not go to every one but there were

15   some occasions when we went with the medical investigator.

16   Q.    And did you go to this particular scene?

17   A.    I did.

18   Q.    Were you directed to a certain area by law

19   enforcement?

20   A.    Yes.  There was a wooded area, a bushy area

21   covered with trees and bushes and with lots of leaves

22   underneath these trees.

23   Q.    Okay.  And could you describe to the ladies and

24   gentlemen of the jury, Doctor, what you observed at the

1    destination where you were directed?

2    A.    Many leaves were covering what looked like a

3    partially decomposed body.  Most of the body was covered

4    except for parts of the head, and the areas that were not

5    covered were very dried parchment-like skin, like parchment

6    on a book.

7         In addition to that there were many maggots

8    involving consuming tissue parts of this particular

9    deceased person.

10   Q.    Okay.  You've used a couple words, Doctor, and we

11   could either talk about those now or we are going to go

12   through it a little bit later, but you used the word

13   decomposition.  What does that word mean, if you could

14   explain that.

15   A.    It's anything that is killed, whether it's human

16   beings or deer on the road or birds, soon undergo a process

17   whereby tissue breaks down, blood breaks down.  Insects,

18   for example flies, lay eggs almost before death in humans

19   or shortly thereafter, and 24 hours later those are hatched

20   into what become maggots, and I describe maggots which are

21   white small insect creatures which consume tissue, whether

22   it's a human being or a dead bird or a dead deer on the

23   road, whatever that may be.  And then there are different

24   kinds of decomposition stages, that is depending on the



1    length of the time of the person and also heat and other

2    factors.

3        Q.    Okay.  And when you examined the body at that time

4    you saw evidence of decomposition?

5        A.    Yes.

6        Q.    And maggots were on or in the body?

7        A.    They were abundant either on or in the body, yes.

8        Q.    Now, the body was moved to the coroner's lab; is

9    that correct?

10       A.    Yes, it was.

11       Q.    And I assume law enforcement officers were at the

12   scene then at lower Millcrest Park when you were there?

13       A.    They were there and the area was cordoned off.

14       Q.    So they would have been there prior to you getting

15   there and called you in?

16       A.    That's right, they were.

17       Q.    Now, was an autopsy done the next day, I believe

18   on June 2, of 1994?

19       A.    Yes, it was.

20       Q.    Where was that done?

21       A.    At the Hamilton County Coroner's office here in

22   Cincinnati.

23       Q.    And was that done by you?

24       A.    Yes, it was.

1    Q.    And identification was made at a later time that

2    this was the body of Judy Smith; is that correct?

3                    MR. ANCONA:    Objection.

4                    MR. TIEGER:    You can answer that.

5    A.    Yes, it was.

6    Q.    If you could, Doctor, could you describe what if

7    any clothing the person who was later identified as Judy

8    Smith had on?

9    A.    Briefly, she had a polyester white exercise suit

10   with blood stain on its outside and inside.

11   Q.    Now Doctor, if I could, you are referring to a set

12   of documents that looks like several pages; is that a death

13   record and postmortem examination, your typewritten report

14   of what you did at this time?

15   A.    Yes, it is.

16   Q.    I believe that's been turned over to Mr. Ancona as

17   part of the discovery in this case, and if you'd like to

18   refer to it to refresh your recollection during this

19   testimony, you may do so.

20   A.    Thank you.

21   Q.    And as far as the clothing, you were talking about

22   the clothing?

23   A.    Yes.  There was a white jump suit or exercise

24   suit, there was a pink-red bikini top, and there was a

1    pink-red bikini bottom.

2        Q.    Okay.

3        A.    Three pieces of clothing.

4        Q.    And at a certain point, Doctor, did you determine

5    later on during your examination of the body that there

6    were stab wounds present in the body?

7        A.    Yes.

8        Q.    And did the -- some of the -- were there tears on

9    any of this clothing?

10       A.    There were many, and many -- there were multiple

11   tears and each tear corresponded to the wounds on the body.

12       Q.    So the clothing tears corresponded to the stab

13   wounds?

14       A.    Yes.

15       Q.    Would that indicate to you that the stab wounds

16   were through the clothing and into the body?

17       A.    Yes.

18       Q.    As far as what you did next, did you determine the

19   height and weight of Judy Smith?

20       A.    Yes.

21       Q.    Okay.  And could you describe that for me?

22       A.    She weighed 130 pounds and measured 66 inches

23   which is five foot six inches.

24       Q.    And as you did your examination what affect did

1   the decomposition have on your ability to do this

2   examination?

3      A.   Well, as I described in the autopsy report, the

4   eyes were absent, secondary to decomposition, and the left

5   eye socket was filled with the maggots as I had described

6   earlier, and the right side was partially filled.

7      Q.   What about the teeth, Dr. Gerber?

8      A.   The teeth were present.

9      Q.   And was there anything unusual about Judy Smith's

10   teeth?

11      A.   There's a word I used called diastema,

12   D-I-A-S-T-E-M-A, and it refers to the open space between

13   the two upper teeth or two lower teeth, whichever it may

14   be.  In her case it was the upper central incisors, as I'm

15   pointing on my own face, that were spread apart wider than

16   usually are identified in humans, and they were rotated

17   laterally, that is this way, away from the center of the

18   face.

19      Q.   What about her hair?

20      A.   She had 12-inch long blond hair.

21      Q.   Did your external examination continue to look at

22   her fingernails at all?

23      A.   Yes.

24      Q.   And could you describe those fingernails for the

1    jury?

2        A.    All her digits were present, so all fingers were

3    present and there was red fingernail polish on all the

4    fingernails and the fingernails were not damaged in any

5    way.

6        Q.    Okay.  And was there any evidence at all that

7    there was any skin of an attacker or any reason to believe

8    that she scratched her attacker?

9                MR. ANCONA:   Objection, leading question.

10       Q.    I could rephrase that.  Do you have any opinions,

11   based on your education, background and training, as far as

12   whether the status of her fingernails and whether or not

13   those were used to scratch anybody, based on your

14   examination?

15       A.    We did clip the fingernails, as is the case in

16   these kinds of autopsies, and to my knowledge no tissue was

17   found underneath these fingernails.

18       Q.    You didn't see any evidence of skin under the

19   fingernails?

20       A.    I did not see any, no.

21       Q.    Okay.  Now, moving onto your further external and

22   internal examination of Judy Smith's body, Dr. Gerber.  I

23   think you marked your postmortem examination by different

24   areas and I think you called those areas A, B, C and so

1    forth.   Would that be the easiest way to go through the

2    injuries that you noted to Judy Smith?

3        A.    Yes.   In summary, for the beginning I described

4    things anatomically, for example, as the right breast being

5    right A, as in apple.   The left breast area was B, as in

6    boy.   And then each wound in those areas, which was more

7    than just the breast but the chest and that area, was

8    described because there were so many injuries.

9        Q.    Starting with Area A that you've called it the

10    right breast, could you describe to the jury what you found

11    in that area of the body?

12        A.    In the right -- pardon me.   In the right breast

13    there were six stab wounds and I numbered them 1 through 6.

14    As I indicated earlier, the anatomic location was indicated

15    by letter A, and then within that area I used numbers 1

16    through 6.

17        Q.    Okay.  Just starting out however you feel

18    comfortable, Dr. Gerber, if you could just describe to the

19    jury those six wounds, where they were, what path they took

20    and so forth.

21        A.    Since there were so many we grouped them, or I

22    grouped them, and rather than describing each one, unless

23    indicated or questioned otherwise, I will summarize that

24    the six wounds in this particular area of A, right breast,

1    as I'm pointing on myself, involved the wound to the middle

2    lobe of the right lung, this side, with three penetrations,

3    and the right lower lobe, as I'm pointing on myself.  So

4    these were six penetrations of the middle and lower lobes

5    of the right lung, middle and lower lobes, and the greatest

6    depth of the injury was to five inches in depth, about this

7    long, as I'm showing with my right hand.  The direction

8    was, as best could be determined, was from front to back.

9        Q.   And as far as the seriousness of those wounds,

10   Dr. Gerber, how serious were those stab wounds?

11       A.   The lung is a very vascular organ and it has many

12   large blood vessels.  Some people can easily die very

13   quickly, that is anybody can die very quickly from serious

14   injuries just to the lung itself.  So these were fatal-type

15   injuries unless immediate medical attention would have been

16   rendered.

17       Q.   Moving on then, Doctor, would that be appropriate?

18       A.   That's fine.

19       Q.   To Area B, the left breast area.  Could you

20   describe the wounds to that area?

21       A.   As I indicated and I pointed on myself and I am

22   doing so now, the left breast area encompassing in this

23   case more than just the left breast itself, there were

24   wounds, as I numbered them 7 through 11, and they involved



the sac around the heart called the pericardial sac or

pericardial bag that holds the heart in place and protects

it, as well as the heart itself.  There were a total of 12

penetrations into the pericardium, the sac-like structure

around the heart, as well as into the heart itself, in this

particular group of injuries labeled Group B, left breast

and number 7 through 11.  The maximum depth of penetration

of this particular set of injuries was four-and-a-half

inches, a little less than I just mentioned above where it

was five inches.

    Q.    Doctor, you've indicated to the jury that there

were 12 penetrations but only five stab wounds.  Could you

explain how five stabbings can make 12 penetrations?

    A.    If you look, as I am demonstrating, and have to

imagine in your mind that the sac is around the heart, a

wound could go through one side and then out the other, or

it could also go obliquely across the sac-like covering I'm

describing and there could be two wounds that way, so they

could add up to more than one would normally expect.

    Q.    And as far as the wound path on those wounds, what

would the wound path have been?

    A.    These were frontward to backward.

    Q.    And were any of these serious or fatal-type

injuries?

1      A.    They were.  They were very serious.  One was to

2    the right atrium, as you all know in the jury, there are

3    four chambers of the heart.  There are two on the right and

4    two on the left.  Right atrium, left atrium.  Right

5    ventricle and left ventricle.  And in this case one was to

6    the right atrium, two were to the right ventricle and two

7    were to the left ventricle.

8      Q.    And these are serious, fatal wounds?

9      A.    They are very serious, fatal wounds.

10     Q.    Along with at least one of the wounds to the right

11   breast area that you talked about before?

12     A.    Yes.  I should qualify this in saying that the

13   pericardial sac can be injured without too much difficulty.

14   It's the heart itself, of course, which is the most serious

15   problem in this particular instance.

16     Q.    Moving to Area C, the left mid abdomen.

17     A.    In this area, left mid abdomen, as I'm pointing on

18   myself, as I'm partially standing here, there were wounds

19   12 through 16.  And in summary, these involved the left

20   diaphragm, as you know the left hemidiaphragm is the part

21   that supports the lungs and helps one breathe.  But more

22   importantly, one was to the left lobe of the liver which

23   would be a little bit just to the left of midline, as I'm

24   pointing on myself, and the diaphragm and the liver were

1    involved in these particular sets of wounds.

2        Q.    And were any of these stab wounds serious?

3        A.    Well, it depends a little bit, in this case one

4    can receive a fair amount of injury to the liver, it

5    depending on where the exact liver injury is.  But liver

6    hemorrhage is very potentially serious but can be

7    surgically resolved if immediate care is obtained.

8        Q.    So out of the 12 -- number 12 through 16, the stab

9    wound to the liver, out of that grouping, would have been

10   the most serious of those stab wounds; is that correct?

11       A.    Of this group, yes.

12       Q.    And what was the direction of that wound path?

13       A.    This was again front to back.

14       Q.    Meaning the knife came in the front, toward the

15   back --

16                    MR. ANCONA:    Objection.

17       A.    Whatever object --

18       Q.    What would you mean by front to back?

19       A.    I am just -- I would say front to the back part of

20   me.   Whatever sharp object was used to cause this.

21       Q.    Moving next to Area D.  What area would that be?

22       A.    This was labeled the left lateral abdominal wall.

23   If I may just stand I could just point to myself.  Like

24   here.  There were two stab wounds and these really were not

1  as significant as the ones we just described above, or

2  discussed above.

3      Q.   Okay.  Moving to Area E, the back of the torso.

4      A.   In this group there was one major injury which

5  involved the liver again, and the diaphragm, which I just

6  described.  In this particular instance the right lobe of

7  the liver, as I'm pointing on myself here, from the back,

8  was involved.  And that maximum depth of that wound was six

9  inches.

10     Q.   Would that have been the deepest penetration that

11  you noted, Dr. Gerber, is the six inch penetration?

12     A.   Yes.  We have had four-and-a-half inches up to six

13  inches so far.

14     Q.   And six inches is the deepest one you've described

15  for the jury?

16     A.   Yes.

17     Q.   What would the wound track be on stab wounds 19

18  through 21?

19     A.   In terms of the direction?

20     Q.   Yes.

21     A.   Number 19 was backward to frontward because that

22  was from the back.  And then there was, Number 21 was again

23  part of the back of the torso.  The next, 22 was in the

24  buttocks, that is the right upper buttocks as I'm pointing

1   on myself, over this way.

2       Q.   Let me go back a little bit.  As far as the back

3   of the torso, when you say "back of the torso" what, if you

4   could show the jury what area you are describing there?

5       A.   I'm considering the torso in this area here.  The

6   buttocks, of course, are here, and the torso would be from

7   here up to the shoulder area.

8       Q.   So wounds 19, 20 and 21 were to the back of the

9   body of Judy Smith?

10      A.   Yes.

11      Q.   And how serious -- I know you said some stab

12  wounds were more serious than others.  How serious were

13  these stab wounds to the back of her torso?

14      A.   Most of these were soft tissue injuries and

15  skeletal muscle injuries.  As I indicated the one in Area

16  E, the back of the torso involved the liver, that was the

17  most serious of the back injuries, the other ones involved

18  mostly soft tissue and, of course, you can ooze and loose a

19  lot of blood with that, but not with a significance.  You

20  can with a major organ like the liver, lungs or heart like

21  we described, or I discussed above.

22      Q.   And two of the penetrations on the back of the

23  torso wounds went through the liver?

24      A.   Yes.

1    Q.    Serious injuries, Dr. Gerber?

2    A.    I just need to qualify my statements a little bit.

3    We are dealing with a very decomposed body.  We are dealing

4    with dry tissue and the maximum observation that could

5    normally be made with a case like this is not possible

6    because of the decomposition.

7    Q.    Okay.

8    A.    So these were best estimates and best observations

9    at this point in time.

10    Q.    There has been evidence, Dr. Gerber, in this case

11    already that Judy Smith was last seen early in the morning,

12    or sometime midmorning, around noon time or so on the, I

13    believe Saturday, the 28th of May.  You observed the body,

14    I believe on June 1, at the scene?

15    A.    Yes.

16    Q.    Would the amount of the decomposition be

17    consistent with the body being left there for that amount

18    of days?

19                MR. ANCONA:  Objection.

20                MR. TIEGER:  You can answer that.

21    A.    It's very difficult to put a precise time on a

22    person's time of death with decomposition.  Good estimates

23    can be made, and as I indicated earlier, fly eggs are laid

24    in the eyes, for example, right, or soon before death or

1    right after death.  Twenty-four hours later the eggs are

2    hatched into maggots.  But then other circumstances are

3    very important.  The temperature of the day, the place,

4    outside, cold, heat, inside, exposure, but the particular

5    case under discussion, it is consistent with that kind of

6    time frame.

7         Q.    Thank you, Doctor.

8               Moving to Area F, the buttocks.  Did you find any

9    stab wounds there?

10        A.    Yes.

11        Q.    Could you describe those for the jury?

12        A.    There was, Number 22 was the right upper buttocks.

13   Number 23, left lower; 24, left lower; and there were three

14   to the buttocks.

15        Q.    Okay.  Moving to Area G, the neck.  Could you

16   describe what you found in that area?

17        A.    In the left posterior neck there was a gaping

18   wound, but part of the problem with observing on the left

19   side of the neck was there was marked decomposition so that

20   the exact details could not be identified because the

21   skeletal spinal column was identified.  There was at least

22   one and that's all I could identify.

23        Q.    Is there a term that you've heard of called

24   skeletonization or a body -- or a certain part of the body

1    being skeletonized?

2        A.    Yes.    That's when most or almost all of the soft

3    tissue has disappeared and all that remains is bone.

4        Q.    And did you find any evidence of skeletonization

5    in the body of Judy Smith?

6        A.    The left side of the neck was the most prominent.

7    And then again I mentioned that her eyes were absent.    But

8    she did have skin covering throughout the rest of her body.

9        Q.    You also said, I believe, somewhere in your

10   autopsy that the feet were marbleized.    What does

11   marbleization or marbleized mean?

12       A.    Marbleization is another form of another stage of

13   decomposition.    It's an earlier stage where the blood

14   vessels become accentuated because the blood products break

15   down and leach out into the surrounding tissue.    So as I'm

16   pointing to my vein on my hand here, if a person dies the

17   accentuation of that pattern will be that much greater than

18   normally identified because the blood breaks down and leaks

19   out into the surrounding tissue.    And it gives a pattern of

20   marble of a floor, a very meted pattern that you would see

21   on a floor, kitchen floor, for example, that has a

22   marbleized pattern.

23       Q.    Doctor, moving on now to the upper and lower

24   extremities, if we could.    Would that be the next area

1    that's logical to follow now?

2        A.    Yes.

3        Q.    Before I do that, how many total wounds then would

4    there have been to the -- that we've already discussed, to

5    the body of Judy Smith?

6        A.    So far we've discussed 25 wounds.

7        Q.    Now moving to the upper and lower extremities, how

8    many stab wounds and incised wounds did you find in the

9    extremities?

10       A.    There were 15.

11       Q.    Would that be 15 separate from the 25?

12       A.    There were 15 separate ones that I could identify.

13       Q.    And again, did you --

14       A.    I'm sorry.  Yes, separate from the 25.

15       Q.    If you could just go through those for the jury.

16   What areas of the body are we talking about when we are

17   talking about the extremities?

18       A.    Again, for purposes of clarity and illustration in

19   this particular case, the left arm being from the shoulder

20   to the elbow, forearm and hand, were designated as Area A;

21   and then -- and there were nine wounds on that side.  Right

22   hand was designated Area B, and there were three wounds on

23   that.  And then the next area was Area C, that's the left

24   leg, and there were three wounds in that area.

1    Q.   And if you could just very briefly, Doctor, go

2    through each of those wounds and tell the jury where on the

3    body they were and what type of stab wounds they were.

4    A.   In the first instance, beginning with Area A, the

5    left arm, that is the left lateral arm, there was an

6    incised wound, and by that I mean it was longer than it was

7    deep, and to further explain the words that I've been

8    using, a stab wound is longer than it is wide.  So

9    therefore, just for example, using the sharp edge of this

10    pen and going this way two inches, would be a stab wound.

11         If this were a sharp blade and I went this way, it

12    was one-half inch deep and four inches long, that would be

13    an incised wound.  So there is a difference between incised

14    wounds and a stab wound.

15         In this particular case it was an incised wound.

16    Q.   Are all of these wounds that you've described,

17    Dr. Gerber, consistent with coming from a knife?

18    A.   I can't say knife for sure.  What I can say is it

19    was a sharp blade of some sort.

20    Q.   Okay.

21    A.   Whether it was a box cutter, knife, or something

22    used in the kitchen, something used in the shop, it had to

23    have a sharp edge to it.

24    Q.   So you started with Number 1.  If we could move to



1    Number 2 then.

2        A.    Number 2 was a very superficial wound and it just

3    was that, not involving much more than soft tissue.

4            Number 3 was on the shoulder -- we are still

5    dealing with Area A and the left side was a superficial and

6    penetrating stab wound.  Number 4 was a penetrating and

7    superficial stab wound; and Number 5, on the posterior

8    forearm, that is -- we arbitrarily use the body, as I am

9    standing here, anterior and posterior, for purposes of

10   anatomic description and diagnosis and examination.  So

11   this is anterior, and this is posterior.  So that's the way

12   I am describing in this particular setting.

13       Q.    Okay.  Moving onto the hand, then, the left hand?

14       A.    Number 6 was on the left extensor surface of the

15   hand.  This is the extensor surface as I am demonstrating

16   here -- I'm sorry, this is the flexor surface, excuse me.

17   This is the extensor surface, but I previously just said

18   this is anterior and posterior, so they are interchangeable

19   in that sense.  And --

20       Q.    Go ahead.

21       A.    On this surface there was an incised wound.

22       Q.    Okay.  What about Number 7?

23       A.    Number 7, palmar surface, where the palm of your

24   hand -- all of you know what the palm is, it was on this

1    side, and then on the index finger being this finger here,

2    there was another wound; and Number 9, still dealing with

3    the left hand, was on the palmar surface.

4        Q.    Moving to the right hand, then.

5        A.    We had 10 through 11 and 12 and on the palmar

6    surface of the right hand, as I am demonstrating here,

7    there was a wound, incised wound.  Number 11 was an incised

8    wound; and again, Number 12 was also, all on the palmar

9    surface.

10       Q.    Moving on then to Area C, the left leg.

11       A.    There were three wounds, as I mentioned before, in

12   the left leg.  One was on the medial aspect of the left

13   thigh and I'll stand up to demonstrate that and demonstrate

14   on myself, I'm pointing to the right, I'm sorry.  This

15   would be the left thigh here.  And Number 14 was on the

16   left lateral aspect of the thigh, as I'm demonstrating

17   here.  And Number 15 on the left lateral aspect of the

18   thigh, in towards the midline.

19       Q.    Doctor, have you heard of the term "defensive

20   wounds"?

21       A.    Yes.

22       Q.    And could you describe to the jury what those are?

23       A.    Defensive wounds usually involve ones person, a

24   person protecting themselves, and they tend to be below the

elbows down, they don't have to be on the extremities, but

they could even be up here.  They could be here, depending

on the circumstances.  They also could be on the legs, in

the medial aspect of the legs, or even lower, or lateral

aspect of the legs, too.

Q.    Why are they called defensive wounds, Dr. Gerber?

A.    They're called defensive wounds because a natural

inclination of a person is to ward off attack like this

way, or this way, or clamp legs together, or whatever

happens to be the situation to prevent injury from

oneself -- on oneself.

Q.    Doctor, do you have an opinion, based on your

examination of the body of Judy Smith, your training,

background, experience, whether Judy Smith had what you've

called defensive wounds?

A.    Yes.  These were defensive wounds that we have

described on the upper extremities and on the lower

extremities.

Q.    Doctor, moving onto the body cavities.  Anything

that you feel is remarkable in that examination as far as

the further internal examination of the body?

A.    No.  As I mentioned all the injuries to the

important organs we've discussed and the rest of the

examination was really quite unremarkable, other than to

1    say that the brain had deteriorated into a green mushy

2    substance so it had lost its form.    But she had no

3    identifiable congenital abnormalities or any kind of a

4    pathological processes that we could tell, or that I could

5    tell at this time.

6        Q.    Did you find any evidence of rape at all,

7    Dr. Gerber?

8        A.    Semen analysis was done -- I should change that to

9    say that swabs were done of the anus and the oral cavity

10   and the vaginal region and the cervical swabs and no semen

11   was identified.

12       Q.    And going on to the microscopic analysis.    If you

13   could describe to the jury what a microscopic exam is, why

14   that's done, and what the results are in the blood and body

15   of Judy Smith?

16       A.    We often send specimens to a histology laboratory.

17   In this case it was within house and had sections cut so we

18   could examine them under the microscope to look for

19   pathological process.    None were found in this case except

20   for autolytic change.    The word autolytic change refers to

21   postmortem decomposition.    Specimens were sent, of blood,

22   for toxicology analysis and in this case it was sent

23   in-house at the Hamilton County Coroner's office.

24       Q.    And as far as Ethyl alcohol, what is Ethyl alcohol

1    and what were the results of that test?

2         A.    Ethyl alcohol was .05 grams per hundred m-l, and

3    is consistent of decomposition alcohols.  When a person has

4    undergone this amount of decomposition .04 to .06 grams per

5    hundred m-l is a very common finding.  So all the alcohol

6    found in her was consistent with decomposition alcohol as

7    formed by the body as a part of decomposition.

8         Q.    Not from drinking alcohol like a beer or a mixed

9    drink; is that correct?

10        A.    That's correct.

11        Q.    And as far as the, whether there were any drugs in

12   her blood, as far as the analysis there, what were the

13   findings on that?

14        A.    There were three drugs, one was Butalbital,

15   B-U-T-A-L-B-I-T-A-L; and another one was Carisoprodol,

16   C-A-R-I-S-O-P-R-O-D-O-L; another one was Meprobamate, and

17   that's M-E-P-R-O-B-A-M-A-T-E, they were of very low levels

18   and not in any way toxic or lethal.

19        Q.    Are these street drugs, Doctor, or are these

20   prescribed drugs?

21        A.    These are prescribed drugs.

22        Q.    What type of drugs are they?  What do they do?

23        A.    They are generally the uhm, an antisedative-type

24   drugs, they are in that family.

1    Q.    Sedative drugs?

2    A.    Yes.

3    Q.    And then you talked about the serology.

4         Doctor, as far as the scene itself, going back to

5    Millcrest Park, did you notice any blood at the scene of

6    the offense, whether it be on the ground, on the leaves or

7    so forth?

8    A.    Not very much underneath her at all.  The blood

9    was caked or dried on her clothes, as well as on her body,

10   whatever was left.

11   Q.    And as far as blood on the scene, on the ground,

12   in the area, did you notice any blood at that area?

13   A.    No, I did not.

14   Q.    And if somebody, in this case, Judy Smith, would

15   have been killed in the spot where she laid, where you saw

16   her, would you've expected to see blood at the scene at

17   all?

18              MR. ANCONA:    Objection.

19   Q.    Do you have an opinion, Doctor, based on your

20   training, background and experience, education, whether

21   based on your examination, and your going to the scene and

22   your doing the autopsy, there would have been blood either

23   present or absent at the scene in Millcrest Park where you

24   found her.

1          MR. ANCONA:    Objection.

2          MR. TIEGER:    You can answer, Doctor.

3    A.    There should have been some evidence of blood

4    under her body if she was killed right at that spot, just

5    from the massive blood loss she would of had to suffer.  As

6    I mentioned earlier, some of it would have been consumed by

7    insect activity but there would have been something there,

8    more than there was.

9    Q.    Okay.  And as far as -- let me strike that.

10         The amount of force it would have taken to inflict

11   these type of wounds, how much force, if you know, Doctor,

12   would have been necessary to inflict the type of stab

13   wounds that you've described to the jury?

14   A.    I can't give any pounds per square inch.  I can

15   just say they would have taken substantial force of an

16   adult to do this to another adult.  It does not rule out

17   any kind of sexual differentiation.  A strong woman could

18   harm a weak man and vice versa; and a strong man could harm

19   a weaker woman.  So it would have to do more with muscle

20   strength and size of somebody to overcome somebody else and

21   be able to do this to one another.

22   Q.    I think you used the word "significant force"?

23   A.    Yes.  It would take very significant force in a

24   child, even a, a young child could not do this.

1    Q.    Okay.  Did some of the stab wounds go through bone

2    at all or cartilage or did they all just go right to the

3    organs that you've described?

4    A.    After looking very carefully we really could not

5    find any bony injuries of any kind in this case.  So soft

6    tissue injuries were all that we could identify.

7    Q.    And in this type of case, Dr. Gerber, as far as

8    the amount of blood that would have been on the attacker,

9    do you have any opinions as to that question?

10    A.    Well, since we indicated, or I indicated that the

11    lung and the heart were major organs of injury, there had

12    to be spurting blood coming from some of these wounds

13    immediately at the time of the act, so that it would be

14    impossible to conceive that somebody would not have some

15    blood on them, if this had been done.  That would be very

16    unlikely and to me impossible to see that kind of or to

17    believe that that could be so.

18    Q.    Okay.  How much blood would you expect -- and let

19    me ask another question first, as far as the order of the

20    stab wounds.  Can you tell the order of these stab wounds,

21    Dr. Gerber?

22    A.    I can't tell the order.  As we went through this,

23    indicating anatomic areas, descriptions of this kind of

24    complexity requires documentation from head to toe, and as

1    I did from top to bottom, and then the extremities came

2    last, more out of simplicity and clarity than any other

3    reason, but I do not know which one came first or last.

4        Q.    So you don't know whether the stab wound to the

5    heart could have come after she was already dead from a

6    stab wound to the liver, let's say.

7                MR. ANCONA:  Objection, asked and answered.

8        Q.    Doctor, do you have an opinion as to whether the

9    heart stab wound came first, the liver, or any of those

10   things you've talked about?

11       A.    I don't really know which one came first in these

12   caes -- in this case.

13       Q.    When somebody is fatally stabbed, let's say the

14   first stab wound, wherever it might have been, does the

15   blood stop flowing at that point in a person or --

16       A.    Well, not immediately.  People can live for a

17   little bit even with major injuries to the heart.  So it

18   depends on what kind of level of consciousness this woman

19   had at the time this happened.

20       Q.    Okay.  And as far as going back to how much blood

21   would have been on her attacker.  Would it be the amount of

22   blood that somebody could wipe off quickly, and if so, do

23   you have an opinion as to that?

24                MR. ANCONA:  Objection.



1          MR. TIEGER:  You can answer that.

2     A.    In my experience I have seen some very minimal

3  injuries and with very minimal evidence of blood on the

4  person, that's possible.  I have also seen the opposite,

5  where a vital organ, such as the heart was injured and then

6  there was a fair amount of blood.  Certainly there had to

7  be some and it's clear that she had a lot on herself.  To

8  have none would be unthinkable and to me unrealistic.

9     Q.    And as far as -- let's say there would be blood on

10  the attacker's hands.  Would that be fair to say, Doctor?

11    A.    Assuming that person didn't have gloves on.

12    Q.    Okay.  And could that person wipe their hands off?

13          MR. ANCONA:  Objection.

14    A.    Superficially you can clear blood off but it does

15  leave some stains.

16    Q.    I understand that, Doctor.

17          So if I understand you correctly, in your opinion

18  the attacker would not be covered in blood, so-to-speak; is

19  that fair to say?

20          MR. ANCONA:  Objection leading.

21          MR. TIEGER:  You can answer that.

22    A.    Well, assuming they weren't wrestling with this

23  person, had just, you know, intimate body contact, under

24  those circumstances there would be blood all over the

person.  But with several stab wounds there wouldn't have

to be much blood at all.

Q.    Okay.

A.    It would be depending on the circumstances of the

altercation.

Q.    Doctor, how long would the onset of death have

been after the stab wounds?

A.    It varies a lot with my experience.  One vessel,

such as the femoral artery or femoral vein, for example, a

person could be dead within an hour with no medical

attention.  Another instance, that I have just done

recently where the femoral artery and vein were lacerated

with a gunshot wound, they were dead within 45 minutes with

no medical care.  So it does vary to some extent.

Q.    On your postmortem examination, on the death

record, you indicated that it would take minutes from the

interval between the onset of the injuries to death.  Is

that a fair estimate, Doctor?

A.    As I said, it's hard to tell, but certainly

within, within an hour this lady is most assuredly dead.

Q.    Would she have been unconscious then or unable to

move then after these injuries would have been inflicted on

her?

A.    Well, with shock, which she would have undergone

1    with loss of blood, she would have lost consciousness and

2    then her heart could have still been beating, so she could

3    have bled some after that.

4        Q.    Okay.  Doctor, based on your training, experience,

5    education, do you have an opinion as to the cause of death

6    of Judy Smith?

7        A.    This is multiple stab wounds of the chest,

8    abdomen, back and extremities, and the manner of death is a

9    homicide.

10       Q.    I'm going to show you some exhibits, if I could.

11             If you could look at that and let the ladies and

12   gentlemen of the jury know what that is, it's State's

13   Exhibit Number 1.

14       A.    This is a black and white photograph with leaves

15   partially covering the head of the decedent, which we have

16   been discussing.

17       Q.    Is that the scene as it existed when you got there

18   at lower Millcrest Park?

19       A.    That's right, it is.

20       Q.    Exhibit Number 2?

21       A.    This is a black and white photograph with the face

22   partially uncovered and the teeth, as I had described them

23   earlier in the upper part of the jaw, as well as all the

24   maggots infesting this particular decedent.

1    Q.    And again is that taken at the scene?

2    A.    Yes, it was.

3    Q.    Are those fair and accurate representations of the

4    way the scene looked when you were there?

5    A.    Yes, they are.

6    Q.    Exhibit 3?

7    A.    This is a picture of the head and the left side of

8    the neck area, an area that I described revealing the

9    partial skeletonization and chest and abdomen in the morgue

10   at the Hamilton County Examiner's office with the extensive

11   maggots present on the decedent.

12   Q.    Exhibit 4?

13   A.    These are two pictures in color, one is with the

14   body partially uncovered, face up, arms up like this and

15   legs spread open, partially covered by leaves and more

16   significantly by maggots.  The upper picture is a color

17   picture of the bikini pink top that I had described.

18   Q.    Exhibit 5 and 6?

19   A.    These are four color pictures of the clothing.

20   One was the white jump suit, exercise suit covered by

21   blood.  The other one is the pink bikini top and there are

22   blowups or enlarged portions of the jump suit with the

23   tears in it to illustrate the wounds as I described them

24   that were found underneath these portions of clothing.

1   Q.   Exhibit 7?

2   A.   One is -- one of the pictures here is of the legs

3   and the private parts and the stomach on the anterior

4   aspect in the -- at the park.  Another one is a close-up

5   view of some of the wounds with the maggots around the

6   wounds.

7   Q.   Exhibit Number 8?

8   A.   The one is a picture of the upper torso on the

9   anterior aspect with the face and the arms upward, as I

10  indicated earlier with the leaves surrounding them and the

11  maggot infestation.  The other one is at the morgue where

12  the body had been partially cleaned up and the multiple

13  stab wounds of the abdomen are indicated.

14  Q.   Exhibit 9, 10 and 11, could you describe what

15  those represent?

16  A.   Exhibit 10 and 11 and part of Number 9 illustrate

17  the injuries on the hands that I had described, and the

18  painted fingernails.  Number 9 reveals the incised wound

19  that I described on the leg.

20  Q.   Doctor, on one of the, I believe it's number --

21  some of these hand pictures, it looks like the, for

22  instance 11, on the very bottom picture, it looks like Judy

23  Smith is almost wearing a glove or something on her hand.

24  Is that just the skin peeling off?

1      A.    It's another form of decomposition we call skin

2   slippage.   The skin is like a glove, it starts slipping

3   off, that's what's illustrated in this particular picture.

4   It looks like she has a glove on.   All it really is is the

5   superficial part of the skin called the epidermis which is

6   coming off.

7                MR. TIEGER:   Doctor, thank you for your

8              testimony.   I don't have any questions.

9              Mr. Ancona, I think, has some questions.

10              Maybe we could take a short break to try to

11              figure out his itinerary as far as the plane and

12              so forth.

13                MR. ANCONA:   Fine.

14              (A short break was taken.)

15                      CROSS-EXAMINATION

16   BY MR. ANCONA:

17      Q.    Dr. Gerber, my name is Perry Ancona, I'm

18   representing Mr. Neeley and I have to ask you a few

19   questions, also.

20              Calling your attention again to June 1, 1994.   You

21   had the occasion to go to the Millcrest Park; is that

22   correct?

23      A.    That's correct.

24      Q.    And had you ever been there before, sir?



1    A.    No.

2    Q.    Okay.  Did you go by yourself or did you go with

3    Bob Learman?

4    A.    I went with Bob Learman.

5    Q.    Okay.  And when you arrived there, did you come in

6    contact with Peter Alderucci?  Do you know Peter Alderucci?

7    A.    I'm sorry, but the time length is quite

8    considerable I do not remember.  I do know there were

9    police officers there.

10    Q.    So if I gave you the name of Lieutenant Crowe, or

11    Detective Patrick, or Detective Huston, that would not ring

12    any bells presently?

13    A.    I'm sorry, it does not.

14    Q.    Okay.  You had conversation with law enforcement

15    when you arrived?

16    A.    I did.

17    Q.    And when you arrived there, was the body -- I'm

18    going to show you what the State's deemed Exhibit Number 1,

19    and that indicated the time was 12:30 on 6/1/94, that that

20    was taken, on the back of that.  So you didn't arrive at

21    12:30, did you?

22    A.    I know that I pronounced her at 1:35, it was very

23    shortly thereafter when, before that that we arrived, yes.

24    Q.    Would you look at that photo again, sir?  Are you

1    saying that that's how it appeared when you were there, or

2    that's the general area, or was the body more -- were the

3    leaves more removed from the body when you first observed

4    it?

5        A.    They might have been a little more removed, I

6    really can't recall.

7        Q.    It's hard to say.  Okay.  But that's the general

8    area of the scene that you looked at, at the time?

9        A.    Yes.  She was primarily covered up, but they had

10   really not -- they had not touched the body and they had

11   not turned it.  We did turn it and we did handle it at the

12   scene.

13       Q.    Okay.  You were present when it was turned?  Did

14   you assist in that, sir?

15       A.    I did, yes.  I took many of the -- in fact all the

16   photographs from the time we arrived, almost all of them.

17   I believe Mr. Learman took some, too.

18       Q.    Okay.  Did you sketch the body, sir, at that time,

19   when you were there?

20       A.    Not at that time, I don't recall.  I did that at

21   the coroner's office.

22       Q.    Okay.  And so you wouldn't be sketching the wounds

23   on the body at the scene?

24       A.    No.  That was all done in the morgue at the



1    autopsy.

2        Q.    And would you describe the insects that you

3    observed when you first observed the body?  What types of

4    insects?

5        A.    The ones I recall were the maggots.

6        Q.    Okay.  Did you see any flies, sir?

7        A.    Well, flies were around because they were also

8    laying eggs simultaneously.

9        Q.    Did you see any other type of insects?

10       A.    I did not, no.

11       Q.    Would you say the body was fairly alive with

12   insects and maggots at that time?

13       A.    It was, yes.

14       Q.    Did you observe the person when the leaves were

15   removed or when you first got to look at the body without

16   the obstruction of leaves, were you able to observe any

17   jewelry, watch, or necklace on the individual?

18       A.    I don't recall that right now.  What we do is

19   normally bring the body in, don't remove anything, and then

20   any jewelry is put in -- taken off, identified, put in

21   security at that time.

22       Q.    Okay.

23       A.    The only thing I do as a pathologist is look at

24   the clothing.

1    Q.   Okay.  Did you note that there was any kind of

2    jewelry, as far as your examination's concerned, or would

3    you not note that?

4    A.   We don't normally note that.

5    Q.   Okay.

6    A.   Either here or other places I have worked.

7    Q.   Did you, sir, at the time that you observed the

8    body at Millcrest Park on the 28th of May, 1994, did you

9    obtain and preserve samples of the larvae, maggots, flies

10   or other insects?

11   A.   I think we did but I don't have record of that in

12   front of me and I don't remember.

13   Q.   Okay.  Would that be done by the criminalist?

14   A.   Normally we would take that and send it off to the

15   University of Cincinnati to the entomology department or to

16   the toxicology department for toxicology.

17   Q.   You would agree that those types of maggots,

18   larvae, flies and insects would be important in determining

19   the length of time that the body had been there?

20   A.   They could be very helpful, yes.

21   Q.   Very helpful.  Did you determine the body

22   temperature at the scene, sir?

23   A.   Other than it was warm, I don't recall.  All I

24   have is the autopsy record in front of me.  The other

1    information that Mr. Learman may have recorded I don't have

2    in front of me, so that may have been reported.

3        Q.    When you first observed the body what did you see?

4    You saw a body there, and did you see blood on the body, on

5    the surface of the body, and the clothing of the body?

6        A.    I saw leaves, I saw maggots and then I saw bloody,

7    dried blood on the clothing.

8        Q.    Doctor, are you familiar with the term postmortem

9    lividity?

10       A.    Yes.

11       Q.    Would you agree that is often referred to as livor

12   mortis?

13       A.    Yes.

14       Q.    Would it be fair to say that livor mortis is a

15   purplish-blue discoloration due to the settling of blood by

16   gravitational forces within dilated, toneless capillaries

17   of the deceased skin?  Would that be a fair definition?

18       A.    On a white person livor mortis is either

19   reddish-pink or purple, depending on the length of time.

20       Q.    Okay.  The rest of the definition I provided to

21   you, due to the settling of blood by gravitational forces

22   within the dilated, toneless capillaries of the deceased

23   skin; is that an accurate statement?

24       A.    That's part of it, yes.

1      Q.    Okay.   Would you agree that livor mortis begins

2   within 20 minutes to roughly perhaps a couple hours within

3   the time of death?

4      A.    Livor mortis begins really right away at the time

5   of death.

6      Q.    Process begins right away?

7      A.    Yes.

8      Q.    As far as observational by the naked eye, of

9   seeing livor mortis, can you see it instantly or do you

10  have to be present for a period of time if you're actually

11  observing it?

12     A.    You have to be present for a period of time to

13  observe it.

14     Q.    So the manifestations, the outward manifestations

15  of livor mortis would not be visual for at least 20

16  minutes; is that fair to say?

17     A.    That would be close, yes.

18     Q.    Close in that area?

19     A.    Yes.

20     Q.    Okay.  Would you agree that the process of livor

21  mortis is a gradual process?   Progressively comes more

22  advanced as time passes?

23     A.    Yes.

24     Q.    Sir, would you further agree that if there is

1    livor mortis that approximately eight -- I don't know if

2    I'm accurate on this, 8 to 12 hours after death, that the

3    blood congeals in the capillaries and it's difficult to

4    have blanching or displacement of that coloration?

5        A.    It becomes fixed over a period of time, yes.

6        Q.    And fixed, is that the same term as permanent or

7    something that remains, doesn't change?

8        A.    It's best illustrated by a body that has purple

9    or -- usually purple livor mortis and when you press it

10   with the thumb, for example, there is no more blanching.

11       Q.    Okay.  The decedent female that you observed in

12   Millcrest Park on the 28th of May, 1994, was laying on her

13   back; is that correct?

14       A.    Yes.

15       Q.    Okay.  You saw some people from law enforcement

16   there when you arrived?

17       A.    Yes.

18       Q.    Were they in the area of the body also when you

19   were making your observations, or at least some of them,

20   sir?

21       A.    They were nearby, yes.

22       Q.    Would you say that the face and upper torso were

23   very discolored, almost black with lividity?

24       A.    Really the face had become parchment-like, a dark



1    brown color, which is an advanced state of decomposition.

2    And parts of the body were black, yes.

3        Q.    Okay.

4        A.    The face was dark brown.

5        Q.    Okay.  What I'm asking about the face and the

6    upper torso, would you refer to that as lividity?

7        A.    Generally speaking you use the word lividity as a

8    more immediate, prior to what state of decomposition we are

9    talking.

10       Q.    Okay.

11       A.    It's all a part of a spectrum of decomposition.

12       Q.    Was there livor mortis present though at the time

13   that you observed the body?  At least on the torso, face

14   area?

15       A.    There was marbling, there were different kinds of

16   stages of decomposition.

17       Q.    Okay.  Specifically I'm asking about livor mortis

18   and the term and the definition that I provided to you and

19   you agreed upon.

20       A.    Yes. .In my statement on Page 2 I say livor mortis

21   is absent, but there was some evidence of marbleization,

22   which would be consistent to some degree of fixation of the

23   blood settling.

24       Q.    Okay.

1      A.    It's just that the major decomposition had gone

2    much beyond what is classically called livor mortis, but it

3    is part of livor mortis, yes.

4      Q.    But livor mortis was present, but you're saying it

5    was an advanced stage, that's why we have marbleization?

6      A.    Yes.

7      Q.    Now, was that in the face and upper torso?

8      A.    No.   Everything was gone in terms of that by that

9    time.

10     Q.    Okay.  Now, did you come to a medical conclusion

11   based to a reasonable medical certainty that this body had

12   been laying on its stomach or side and an upper portion of

13   the torso was at an angle that was lower than the feet and

14   the lower extremities?

15     A.    You mean originally, or what?

16     Q.    Yes, sir.

17     A.    In other words, if you have livor mortis, if you

18   have the settling of blood that's a gravitational

19   situation, is it not?

20     A.    Yes.

21     Q.    Did you come to a medical conclusion that the

22   body, during the process of livor mortis was on her face at

23   an angle wherein the upper torso and face were in a lower

24   position than the feet and the lower torso?

1    A.    With the way the body looks, looked at that time,

2    it makes sense that that would have happened, yes, because

3    of the -- the decomposition was most advanced at the top of

4    the head and it decreased, to some extent, towards the

5    legs, which showed the marbleization which we talked about.

6    Q.    Okay.  So you felt the body had been moved or

7    turned?

8    A.    It had been moved, I thought, because of the --

9    that was one issue and the other issue was the lack of any

10    blood around the ground around it, where she was found.

11    Q.    Doctor, based on your observations at the park

12    that day, and your description of an advanced livor mortis

13    in the upper torso and face area, how long would the body

14    have to be laying post death on its face or front torso, in

15    order to have livor mortis be present?

16    A.    Are you talking about face down and buttocks up?

17    Q.    Yes, sir.

18    A.    In relationship to each other?

19    Q.    How long would it have to be laying in that

20    position in order for the observations that you made

21    relative to marbleization, which was an advanced form of

22    the livor mortis, how long would that have to happen for a

23    person to be laying in that position in order for that to

24    set in?

1    A.    I don't know the answer to that.

2    Q.    Would you say several hours, to be fair?

3    A.    I would say a good number of hours, yes.

4    Q.    A good number of hours.  So if the body were moved

5    you are saying it were moved several hours after death?

6    A.    Well, it would be easier to say, to answer the

7    question if, for example, there was rigor left but there

8    wasn't.

9    Q.    There was no rigor mortis present when you

10   observed?

11   A.    No.  Absolutely none.

12   Q.    At the scene or at the time you did the autopsy

13   --

14   A.    Right.

15   Q.    -- is that correct?

16   A.    That's correct.

17   Q.    Since that's absent and we have livor mortis and

18   advanced stages of it being the marbleization, I'm trying

19   to get an idea for the ladies and gentlemen of the jury how

20   long that body would have to be laying at that angle post

21   death to come to that condition?

22   A.    As I said, I don't really know the answer to that.

23   Q.    Would you agree it's at least several hours,

24   though?

1    A.    Yes, I indicated it would be, yes.

2    Q.    Okay.  Did you notice that the lower torso did not

3    have any indicators of lividity?

4    A.    I believe I described the legs as there was

5    marbleization, I'm not sure what all -- I'll look at the

6    report here to answer that.  The skin from the shoulders to

7    the superior of the umbilicus was dark red-brown leathery,

8    so that was very much a leathery kind of a skin with very

9    dried nature.  There was some sparing of the extremities

10   and then there was marbleization of both feet.  So the only

11   significant marbleization was really in the feet, as my

12   description describes.

13   Q.    Dr. Gerber, you said there were anal, oral,

14   vaginal and cervical swabs; is that correct?

15   A.    I did.

16   Q.    And there was no semen identified?

17   A.    That's right.

18   Q.    Now, that does not mean, obviously, the person did

19   not -- was not raped; is that fair to say?

20   A.    What it says is, it's a negative finding and it

21   just says no semen was there.

22   Q.    Okay.  It does not rule out rape is what I'm

23   saying.

24   A.    It does not rule out rape.

1    Q.    When you have these larvae, maggots, blowflies,

2    flies and other insects, they tend to eat the liquid first

3    and then into the fleshy portions, different types of

4    insects eat the fleshy portions of the body; is that

5    correct?

6    A.    Yes.    In fact, any openings, as we have in this

7    case of a lot of openings on the upper torso because of the

8    wounds, one of the reasons we have an appearance here is

9    because of the massive numbers on the chest torso, the

10   maggots getting there, eating up the soft, the liquids,

11   whatever they may be, including blood, and that part

12   becomes much more dried out than the lower part; and

13   therefore because of that it's not really, it's very hard

14   to determine the answer to the question you just posed

15   about how long a body was in a certain position.

16   Q.    Certainly.    But it's possible, sir, medically

17   speaking, that if there were semen that the insects could

18   have eaten that liquid; is that correct?

19   A.    It's very likely that the study gave us this

20   information but whether what it really has to say in terms

21   of significance is hard to determine.

22   Q.    I understand.    All you can really say is there's

23   no semen present?

24   A.    We can say it's absent.

1      Q.    Absent.    And you mentioned before a little bit, if

2    you had, if you did use U.C.'s forensic entomologist, that

3    type of discipline would be able to use maggots, flies,

4    other insects scientifically to try to determine the time

5    and a date of a death on a body; is that correct?

6      A.    Well, when there's more advanced decomposition,

7    when pupa form and when -- even more advanced than this,

8    when we are past the maggot stage to the pupa, that is, the

9    maggots live only so long, six to ten days and then they

10   become pupa, little encased brown capsules, in this

11   particular instance we had evidence that we did not need to

12   go any further in terms of using the insects for further

13   time identification purposes.

14     Q.    Would you agree, though, that the forensic

15   entomologist, if you would have collected specimens the

16   forensic entomologist could look at those and make a more

17   scientific determination for times?

18             MR. TIEGER:    Objection.

19             MR. ANCONA:    You may answer, sir.

20     A.    Well, an entomologist does just that and I'm sure

21   that they could answer maybe within a little bit more

22   precise than what I have, but not much more.    In this

23   particular case it wasn't deemed necessary.

24     Q.    As far as the maggots are concerned they appear a





1    day to three days, do they not?  Within 24 hours?

2         A.    I indicated 24 hours after.

3         Q.    That's the minimal?

4         A.    Flies lay eggs on, as I mentioned earlier, on the

5    almost dead person as well as very soon after death.

6         Q.    A more unconscious persons?

7         A.    Yes, unconscious persons in a well-cared for

8    medical intensive care unit fly eggs are laid, yes.

9         Q.    Did you comb the pubic hair of the decedent to

10   determine whether there were any foreign hairs?

11        A.    We did all that, yes.

12        Q.    Is there a record of that, sir?

13        A.    I do not have that in my autopsy report.

14        Q.    Should it be there, sir?

15        A.    It would be in the entire folder at the Hamilton

16   County Coroner's office if not in the Prosecuting

17   Attorney's office here.

18        Q.    But it was done and the, either the coroner's

19   office has it or the prosecution or law enforcement has it?

20        A.    We combed the pubic hair and then we plucked it,

21   also.

22        Q.    Okay.  Is the purpose to see if there was a

23   foreign hair?

24        A.    That's right, yes.

1    Q.    Okay.  As far as the instrument used to penetrate

2   the body, you said there was 25 wounds, stabs, on the torso

3   and maybe another 15 on the extremities.  You're not in a

4   position to say what that instrument was; is that fair to

5   say?

6    A.    I indicated earlier it would need to be a sharp

7   instrument of some kind.

8    Q.    Okay.  It would have to be sharp, would you agree

9   that you can only tell that with detailed meticulous

10  dissection along the track of the hemorrhage to get a

11  better idea of the wound?

12   A.    Well, we are also dealing with a very compromised

13  decedent here.  The gaping wounds were so decomposed that

14  it was very hard to tell about sharp ends and blunt ends.

15  I said there were no sharp ends, but unless you have a

16  really fresh tissue you can't make that kind of

17  determination.

18   Q.    So you can't say if there's blunt ends or sharp

19  ends?

20   A.    It was very hard to determine.

21   Q.    It's very hard to say what kind of instrument was

22  used except it was a penetrating instrument?

23   A.    We know it was a penetrating instrument.  We know

24  she had both incised and stab wounds.  That's what we know.

1      Q.    Now, as far as blood on the surface of the body

2    that was found, observed, it would have been possible to

3    quadrant that off or dissect it off or make some lines and

4    to test that blood to see if any of that blood was the

5    assailant's blood, is that possible, sir?

6      A.    Yes.   Techniques are available for that.

7      Q.    Do you know if that was done?

8      A.    I don't recall that it was.

9      Q.    Okay.   Was there blood at or near the perimeter of

10   the body, sir?

11     A.    No, just on the body itself, primarily on the

12   clothes, by this stage, it had really been consumed by the

13   postmortem insect activity.

14     Q.    The various medications that you indicated that

15   were found in her system, Meprobamate, that is a medication

16   that affects the central nervous system, is it not?

17     A.    Yes.

18     Q.    And that's also a drug that is a drug of abuse and

19   one of the warnings is you may become drug dependent on

20   this type of thing.   Are you familiar with that, sir or

21   not?

22     A.    Well, it's true with about almost every drug

23   that's prescribed.

24     Q.    Yes.   The Butal -- what was that?  Bu --

1          A.    Butalbital.

2          Q.    Butalbital.   That's also a prescription drug, is

3     that correct?

4          A.    It's part of the barbiturate family.

5          Q.    And is that a drug of abuse, also, sir?

6          A.    It can be.

7          Q.    Are you aware that one of the side effects of this

8     drug caused drowsiness and dizziness, confusion?

9          A.    Yes.

10         Q.    And the other is an offshoot of Soma -- I forget

11    what you said the third one was -- Cari --

12         A.    Carisoprodol.

13         Q.    Okay.   Are you familiar with Soma?

14         A.    Yes.

15         Q.    Okay.   And that's also an addictive drug a drug of

16    dependency, it also affects the central nervous system; is

17    that fair to say?

18         A.    All three of them have a potential for that.

19         Q.    Now, not knowing the time and date of death and we

20    do know the levels in the blood of these medications,

21    prescription medications, would they change as far as from

22    the time of death to the time that they were tested in the

23    laboratory?

24         A.    Yes, but this state of decomposition these would

```
 1    be -- there's redistribution, I explained the alcohol

 2    before.

 3        Q.   Yes, sir, you did.

 4        A.   So this, it's known that there are redistribution

 5    of drugs, and it's very likely they could have been a

 6    little higher at the time of death, we just don't know

 7    that.

 8        Q.   Well, I think you can say that to a medical

 9    certainty, can you not, that if a person were dead more

10    than a couple days, and you have a level of these drugs

11    that we find in the body, that surely prior to death they

12    were at a higher level?

13        A.   Yes, right.

14        Q.   Thank you.  And I think you straightened up

15    something before when Mr. Tieger asked you the question

16    that the onset of death would be less than an hour in your

17    medical opinion, based to reasonable medical certainty?

18        A.   With these extensive injuries, yes.

19        Q.   Yes, sir.  You couldn't say necessarily that they

20    were minutes, even though it says in the report, within

21    minutes, it's more accurate to say less than an hour than

22    it is to say within minutes?

23        A.   I believe that would be a fair statement.

24        Q.   Thank you.  Did you take any x-rays to determine
```



1    whether any portion of any instrument that might have been

2    used broke off by striking a bone?

3            Were any x-rays taken?

4        A.    I know that we had to work on the identification

5    at the -- on the onset, and as I recall, there may have

6    been dental x-rays, but in this case, unless something,

7    somebody is totally -- let me pause a minute.   I believe

8    x-rays were taken but, as I say, I don't have that record

9    and I don't know for sure.

10       Q.    Okay.

11       A.    Because the stab wounds routinely here and where I

12   work now, we do take x-rays for that very reason.

13       Q.    Would the autopsy, postmortem report here refer to

14   x-rays if they were taken?

15       A.    No.   That would be in the master folder in the

16   Coroner's Office here in Hamilton County.

17       Q.    And the prosecutor has access to that?

18       A.    He does.

19       Q.    Now based to a reasonable medical certainty it's

20   almost impossible to say time and date of death in a body

21   like this, is it fair to say?

22       A.    Yes, it's very hard to be very precise.   You can

23   give estimates.

24       Q.    Okay.   We do know that you were in the park on

1    June 1, and we do know that approximately 1:30 in the

2    afternoon, and is it consistent to say that the person died

3    two days or three days earlier than that?  Is that

4    consistent, medically speaking, with what you found on the

5    body with the 24 hour maggots present?

6        A.    That's two days plus -- I think two to four days,

7    somewhere, something like that would be reasonable.

8        Q.    Okay.  So you really can't specify anything more

9    scientific with what you had to go on besides two to four

10   days?

11       A.    It would have to come from other observations,

12   other than the autopsy itself.

13       Q.    Okay.  But you're not in a position to say to a

14   reasonable medical certainty that the date and time of

15   death would be somewhere on May 28, between the morning,

16   late morning hours and early afternoon hours on the 28th.

17   That would be impossible for you with what you have to work

18   with to say that, wouldn't it?

19       A.    I couldn't specify.  I can only say it would be

20   consistent with that.

21       Q.    And you say two days later it would still be

22   consistent with that?

23       A.    Well, that's why this, this is a -- these are

24   estimates, as I mentioned before, and with the postmortem

1  changes I indicated before, the range is days, it's not

2  hours or minutes.

3      Q.   I understand.  So it's a range of two to four

4  days, sir, for the date and time of death?

5      A.   Also, as I indicated earlier in this deposition

6  that it depends what the heat was, how much heat there was,

7  exposure-wise.  Somebody in a basement dead, in a cool

8  basement, deceased, would be slower to decompose than out

9  in a park, for example, where there's heat in the early

10  months of spring or springtime.

11     Q.   And to your knowledge this was out in the park,

12  early month of springtime with some heat?

13     A.   Where we found her, yes.

14     Q.   Yes, sir.  So all I'm saying to you is that with

15  what you have to work with to make a scientific and medical

16  opinion, you can only give us a range of date and time of

17  death of two to four days prior to your observations on the

18  28th -- on the first of June, rather, '94?

19     A.   Yes, because of the variety of circumstances in

20  terms of temperature and so on that affect decomposition.

21     Q.   Sir, did -- when you were present there did the

22  police tell you when they thought the time of death was?

23     A.   Not at all.

24     Q.   Not at all.



1    A.    It was totally unknown at the time about the

2  circumstances.

3    Q.    So nothing was said?

4    A.    We did not know who this was at the time.

5    Q.    Okay.  And sir, based on your observations at the

6  scene, your medical training, your experience and your

7  autopsy, you certainly have no way of knowing who the

8  assailant was that killed this woman?

9    A.    Not from the information I had just at this scene,

10  no, I don't know.

11    Q.    Okay.  At the scene plus the autopsy.  That's all

12  the information you had, is it not?

13    A.    As the forensic pathologist, at the scene and the

14  autopsy is the information I had, yes.

15    Q.    Would it have been helpful to obtain blood samples

16  from individuals to see if any blood matched blood found on

17  the body of the decedent?  Would that have been a helpful

18  situation --

19            MR. TIEGER:  Objection.

20    Q.    -- in an investigation?

21            MR. TIEGER:  Objection.

22            MR. ANCONA:  You may answer.

23    A.    It can be helpful or it cannot be helpful

24  depending on the scene.  As I earlier indicated, if there

1    was a wrestling match between the two, the provocateur, or

2    assaultant and the decedent, and blood was mixed, all you

3    could say that they were both there.

4        Q.    You said this injury could have been -- these

5    injuries, I'm sorry, could have occurred, you're not saying

6    gender-wise, you don't eliminate a woman from causing these

7    injuries?

8        A.    Well, what I was trying to point out in that

9    instance was it had to be somebody strong.  Now a strong

10   woman, strong man or vice versa.  A sexual differentiation

11   can't be made, but it would have to be an adult with

12   strength.

13       Q.    Were you informed by the police that a condom was

14   found not far from the site of the body?

15       A.    I can't recollect that anymore.  I don't remember.

16           MR. ANCONA:   Okay.  I have no other

17       questions.   Thank you.

18           THE DEPONENT:   Thank you.

19               REDIRECT EXAMINATION

20   BY MR. TIEGER:

21       Q.    Doctor, just one or two things on the --

22   Mr. Ancona asked you about the x-rays and whether there

23   would be a broken knife or anything in there.  You did the

24   autopsy, did you find any broken blades or foreign objects

1    in the body at all?

2         A.    No.   As I indicated, we usually, without

3    exception, we x-ray people who have been stabbed or

4    potentially stabbed to look exactly for that, for foreign

5    body and fragments of blade, and we did not find any.

6              MR. TIEGER:   Okay.   That's all, Doctor.

7         Thank you.

8              MR. ANCONA:   Follow-up to that one question.

9                    RECROSS-EXAMINATION

10   BY MR. ANCONA:

11        Q.    The reason you use x-rays, is x-rays are more

12   scientifically reliable than the medical examiner, you in

13   this case, going through and looking for a small piece of a

14   broken off instrument?

15        A.    Right.   That's right.

16             MR. ANCONA:   Okay.   Thank you.

17             THE DEPONENT:   Thank you.

18

19                           _____

20                           JOHN E. GERBER, MD
                             (Signature waived.)

21

22                           - - -

23             DEPOSITION CONCLUDED AT 3:00 P.M.
                             - - -

24

```
 1                      C E R T I F I C A T E

 2    STATE OF OHIO        :
                           :  SS
 3    COUNTY OF HAMILTON   :

 4

 5          I, Barbara Ann Thacker, RPR, the undersigned, a

 6    duly qualified and commissioned notary public within and

 7    for the State of Ohio, do hereby certify that before the

 8    giving of his aforesaid deposition, JOHN E. GERBER, MD was

 9    by me first duly sworn to depose the truth, the whole truth

10    and nothing but the truth; that the foregoing is the

11    deposition given at said time and place by JOHN E. GERBER,

12    MD; that said deposition was taken in all respects pursuant

13    to stipulations of counsel hereinbefore set forth; that I

14    am neither a relative of nor employee of any of their

15    counsel, and have no interest whatever in the result of the

16    action.

17          IN WITNESS WHEREOF, I hereunto set my hand and

18    official seal of office at Cincinnati, Ohio, this 26th day

19    of November, 1999.

20

21

22                                  _____
      My commission expires:        BARBARA A. THACKER, RPR
23    May 15, 2003                   Notary Public - State of Ohio

24
```