# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

David Lee Neeley,
    Petitioner


      vs                          Case No. 1:02cv520
                                   (Weber, J.; Black, M.J.)


Harry Russell,
    Respondent

---

## REPORT AND RECOMMENDATION

---

Petitioner, an inmate in state custody at the Lebanon Correctional Institution in Lebanon, Ohio, brings this action through counsel for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition, respondent's return of writ and petitioner's traverse. (Docs. 1, 4, 10).

### Procedural Background

In September 1997, the Hamilton County, Ohio, grand jury indicted petitioner on one count of aggravated murder as defined in Ohio Rev. Code § 2903.01(A). (Doc. 4, Ex. 1). A jury found petitioner guilty as charged. (Doc. 4, Ex. 4). The court sentenced petitioner to life imprisonment, to be served consecutively to a Kentucky sentence for assault. (*Id.,* Ex. 4).

With the assistance of counsel, petitioner filed a timely appeal to the Ohio Court of Appeals, raising the following assignments of error:

1.  The judgment of conviction is contrary to law and to the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of the offense beyond a reasonable doubt.

2.  The judgment of conviction is contrary to the manifest weight of the evidence.

3.  The trial court erred to the prejudice of appellant by denying his motions for judgment of acquittal pursuant to Crim.R. 29.

4.  The trial court erred to the prejudice of appellant's due process right to a fair trial in permitting the prosecution to commit misconduct in argument, in failing to provide discovery, and in several other instances, by overruling legitimate defense objections and mistrial motions, in violation of appellant's rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Art. I § 10, 16 of the Ohio Constitution.

5.  The trial court erred to the prejudice of appellant's Fourteenth Amendment Due Process right to a fair trial by permitting the jury to view a ghastly, grossly prejudicial videotape which was shown to the jury during trial, but was not admitted into evidence.

6.  The trial court erred to the prejudice of appellant's Fourteenth Amendment Due Process Right to a fair trial by admitting into evidence, over objection, gruesome photos of the deceased at the scene where the body was found.

7.  The trial court erred to the prejudice of appellant's Fourteenth Amendment Due Process Right to a fair trial by permitting police witnesses to give their opinion that other potential suspects were not involved, and their consequent opinion that appellant was the actual killer.

8.  The trial court erred in admitting, over defense objections and motions for mistrial, grossly prejudicial and irrelevant other act evidence, thereby depriving appellant of the fair trial to which he is

entitled by the Fourteenth Amendment to the U.S. Constitution, and Art. I § 16 of the Ohio Constitution.

9.   The trial court erred to the prejudice of appellant's Fourteenth Amendment Due Process Right to a fair trial by refusing to rule on appellant's pretrial motions in limine.

10.  The trial court erred in overruling the defense motion to suppress certain evidence seized from the appellant's residence, in violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, and Ohio Const., Art. I § 14.

11.  The trial court denied appellant due process of law in violation of the Fourteenth Amendment by admitting prejudicial inadmissible evidence, and committed other errors, thereby denying to appellant a fair trial.

12.  The trial court erred in overruling appellant's motion to dismiss the indictment, in violation of the Sixth Amendment of the U.S. Constitution, Art. I § 10, O. Const., and R.C. 2945.71 et seq.

13.  The trial court erred to the prejudice of appellant in entering judgment of conviction and imposing sentence after a trial in which the cumulative and incremental effect of multiple errors deprived the appellant of the fundamentally fair trial required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Art. I § 16 of the Ohio Constitution.

(Doc. 4, Ex. 5). On May 25, 2001, the Ohio Court of Appeals overruled the assignments of error and affirmed the judgment of the trial court and subsequently declined to reconsider its decision. (*Id.,* Exs. 7, 11; *State v. Neeley,* 758 N.E. 2d 745 (Ohio Ct. App. 2001)). Judge Painter filed a scathing dissent, concluding that "[t]he trial was fraught with error." (Doc. 4, Ex. 7 at 32).

Petitioner timely appealed through counsel to the Supreme Court of Ohio, presenting the following propositions of law:

1.  Where constitutional error in the admission of evidence is extant,

such error is harmless beyond a reasonable doubt where the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt. *State v. Williams* (1983), 6 Ohio St.3d 281, followed.

2. Comment in argument to a jury by a prosecutor on the failure of the accused to testify violates the Fifth and Fourteenth Amendments to the U.S. Constitution.

3. The argument by a prosecutor of facts not in evidence, to wit, attributing to the accused an admission never made, and a statement that he had agreed to meet the purported victim in the place where the remains were found, violates the right of the accused to a fair trial under the Fourteenth Amendment to the U.S. Constitution.

4. Instances of prosecutorial misconduct during final argument to the jury must be evaluated for their cumulative effect upon the fairness of the proceedings. *State v. Keenan* (1993), 66 Ohio St.3d 402, followed.

5. Comment by prosecutor during trial of specific, prejudicial facts of other act evidence not relevant to the proceedings violates the right of the accused to Due Process under the Fourteenth Amendment to the U.S. Constitution.

6. Where a court of appeals has found more than one error in its review of a conviction, each of such errors being held harmless, in assessing a claim that the cumulative effect of the errors denied the defendant a fair trial, the court of appeals denies due process by rejecting the claim simply because it found none of the errors were individually prejudicial.

7. The display to a jury in an aggravated murder case of a videotape of the body of the victim where it was found, with flies and maggots infesting the body, particularly the face of the deceased, which videotape is eventually withdrawn and not admitted into evidence, as well as still photos of the same subject matter constitutes an egregious violation of the right of the accused to the fair trial to which he is entitled by the Due Process Clause of the Fourteenth Amendment.

8. A defendant is denied the fair trial secured by the Due Process Clause

4

of the Fourteenth Amendment by the admission of lay opinion testimony by police officers to the effect that no suspects other than the defendant committed the crime.

9.   Where, in a murder prosecution, the state fails to prove beyond a reasonable doubt that the accused committed the homicidal act, identity of the victim, and venue the conviction of the defendant violates due process.

(Doc. 4, Ex. 12). On September 26, 2001, the Supreme Court of Ohio denied leave to appeal and dismissed the case as not involving any substantial constitutional question. (*Id.,* Ex. 14). On November 7, 2001, the Court also denied petitioner's motion for reconsideration. (*Id.*, Ex. 18).

With the assistance of counsel, petitioner filed the instant petition for a writ of habeas corpus  pursuant to 28 U.S.C. § 2254, raising the following grounds for relief and supporting facts which are quoted verbatim:

Ground One: The evidence against Mr. Neeley was insufficient to support a conviction for aggravated murder.

Supporting facts: There was no evidence establishing that the deceased person was killed in Hamilton County, because State's witnesses testified that she did not die in the park in which she was found and that they could not find the location of the murder scene. Judy Smith, the alleged victim, lived in Clermont County. There was no evidence identifying the deceased person as Judy Smith.  There was no evidence that Mr. Neeley killed anyone, or any proof that the deceased person was killed with prior calculation and design.

Ground Two: Prosecutorial misconduct denied Mr. Neeley a fair trial and due process of law.

Supporting facts: Instances of prosecutorial misconduct include, but are not limited to:

5

(1) The State argued in closing that Mr. Neeley had arranged to meet the victim in the park, where the body was found, on the last day she was seen. There was no such evidence in the record.

(2) The State also argued in closing that Mr. Neeley had told a friend that he wanted to kill Judy Smith and that he had plans for the disposal of the body. There was no such evidence in the record.

(3) The State argued that Judy Smith was killed in Millcrest Park in Hamilton County, even though the State's own witnesses testified that they did not find a murder scene there.

(4) The State improperly commented upon Mr. Neeley's refusal to testify.

(5) The State neglected to give defense counsel the statement of one of the identification witnesses that the man she saw in the park had a tattoo on his arm. Mr. Neeley has no tattoos. The State also neglected to inform defense counsel that the police had viewed a security videotape to ascertain the truth of Mr. Neeley's statement that he gone [sic] to a convenience store to buy cigarettes on the morning of Judy Smith's disappearance.

(6) The State told the jury in opening statement that Mr. Neeley had been previously convicted of "shooting another man with a shotgun," even though the court had not yet ruled on the admissibility of the felonious assault conviction.

Ground Three: The cumulative effect of erroneous and unfair rulings by the trial court denied Mr. Neeley a fair trial and the due process of law.

Supporting facts: The trial court's erroneous rulings include, but are not limited to, the following:

6

(1) the trial court refused to rule on Mr. Neeley's pretrial motion in limine to exclude other-acts evidence, and allowed the State to inform the jury that Mr. Neeley had shot "another man with a shotgun" in opening statement before ruling on the admissibility of the conviction. The trial court eventually ruled that evidence about [sic] conviction was admissible, but did not limit the State to the relevant evidence about the status of the conviction. The State was allowed to comment and introduce evidence about the nature of the crime, which had no permissible relevance at trial.

(2) The State was improperly and unfairly allowed to introduce testimony detailing alleged instances of domestic violence by Mr. Neeley against Judy Smith, which had no permissible relevance at trial.

(3) The Court allowed police officers to testify to their opinions [sic] there were no other potential suspects in the alleged murder of Judy Smith.

(4) The trial court failed to properly respond to discovery violations by the State.

(5) The trial court allowed the State to show an extremely gruesome videotape of a dead body to the jury, in addition to overly gruesome photographs, even though the court later decided that the tape could not be admitted into evidence.

(6) The court allowed other [sic] several other items of evidence and testimony that were improper, and that, when considered cumulatively with the other errors, operated to deny the defendant a fair trial.

Ground Four: The cumulative effect of the unfair rulings and the prosecutorial misconduct denied Mr. Neeley due process of law and a

fair trial.

>Supporting facts: The reasons supporting Grounds two and
>three considered together, demonstrate that Mr. Neeley was
>not afforded a fair trial.

(Doc. 1 at 4-5, 10-12). In his return of writ, respondent addressed the merits of petitioner's claims except ground three (6) and ground four. (Doc. 4). Respondent argued that the latter claims were not cognizable. (Doc. 4 at 24-25).

## OPINION

### I. Petitioner is not entitled to habeas corpus relief with respect to his first claim that the evidence was insufficient to support his conviction.

As his first ground for relief, petitioner argues that the evidence was insufficient to support his conviction. Petitioner asserts that there was insufficient evidence of the venue of the crime, the identity of the body discovered, petitioner's participation in the killing and that petitioner acted with prior calculation and design.

Under the standard established by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified principally at 28 U.S.C. § 2254 (d), petitioner is not entitled to federal habeas corpus relief, unless the state court's adjudication of his claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.

An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.). A federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942. The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

When a state court fails to address the constitutional issues raised, the federal court conducts a *de novo* review, instead of applying the AEDPA standard of review which applies only to cases "adjudicated on the merits in state court." *Maples v. Stegall,* 340 F.3d 433, 436-437 (6th Cir. 2003) (finding that in *Wiggins v. Smith,* 539 U.S. 510 (2003), Supreme Court reviewed portion of claim not analyzed by state court *de novo,* without deferring to the state court or applying AEDPA's standard of reasonableness); *see Newton v. Million,* 349 F.3d 873, 877 (6th Cir. 2003); *Davis v. Secretary for the Dep't of Corrections,* 341 F.3d 1310, 1312 (11th Cir. 2003).

The Due Process Clause requires a state to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When petitioner raises an insufficiency of evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied with explicit reference to the criminal offense as defined by state law. *Scott v. Perini*, 662 F.2d 428, 431 (6th Cir. 1981) (quoting *Jackson*, 443 U.S. at 324 n.16), *cert. denied*, 456 U.S. 909 (1982). Any conflicting inferences arising from the

record must be resolved in favor of the prosecution.  *See Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983).  It is beyond the province of the court to weigh the credibility of witnesses, and credibility conflicts must be resolved in favor of the prosecution.  *Id.*  It is the trier of fact's responsibility to resolve conflicts in testimony and to weigh the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court may not substitute its own opinion for that of the trier of fact which convicted the petitioner.  *Id.* at 318-19; *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam), *cert. denied,* 490 U.S. 1049 (1989).

Circumstantial evidence is the proof of certain facts from which the jury may reasonably infer other connected facts. *See State v. Gaines,* No. 82301, 2003 WL 22966190, at *10 (Ohio Ct. App. Dec. 18, 2003), *appeal not allowed,* 809 N.E.2d 1158 (Ohio 2004). In assessing the sufficiency of evidence under *Jackson*, circumstantial evidence alone may be sufficient to sustain a conviction. *Dixon v. Miller,* 293 F.3d 74, 81 (2nd Cir.), *cert. denied,* 537 U.S. 955 (2002); *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996); *Jamison v. Collins,* 100 F.Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002).

The Ohio Court of Appeals made the following findings of fact which are entitled to a presumption of correctness:[1]

On May 28, 1994, the victim, Judy Smith was reported missing in Clermont County, by her sister, Julie Watkins, after Smith had failed to pick up her daughter from school.  Around midnight, Smith's car, a white Chevrolet Lumina, was recovered from Millcrest Park.  Millcrest Park is a Hamilton County park located in Norwood, Ohio.  A body of a woman believed to be Judy Smith was discovered on June 1 at Millcrest Park.  The body, which had been buried under some leaves in a wooded area of the lower portion of the park, was partially decomposed and filled with maggots.  Its back was against the ground, with the head above the feet, and the legs spread apart.

---

[1]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner failed to rebut the court's findings with clear and convincing evidence.

Detective Alderucci, who aided in the recovery of the body at Millcrest Park, testified that, although no one had moved the body from the location where it was found, the body had been moved to that location. It appeared to Alderucci, that based on the position of the body when it was found, lividity was not properly distributed. Further, Alderucci noted that there was no evidence of a fight or struggle, and that very little blood was discovered. Finally, Alderucci noticed that the body was covered with mud, which was not otherwise present at the site.

A search of the park was subsequently conducted, but it did not reveal where the victim had been killed. During the search, however, a temporary order issued against appellant Neeley for Smith's protection, and Smith's purse were recovered from the middle portion of the park. A fingerprint lifted from the purse did not belong to Smith or Neeley.

Dr. Gerber performed an autopsy. He testified that the body was that of a woman weighing about 130 pounds and measuring five feet six inches in height. The woman had blonde hair and had been wearing a white jumpsuit. Dr. Gerber testified that the woman, whom he identified as Judy Smith, had been stabbed to death and had suffered over forty stab wounds to her body. She also had defensive wounds on her upper and lower extremities. Dr. Gerber did not identify any semen on Smith.

While the coroner could not establish which stab wound had ultimately caused Smith's death, he identified several fatal injuries to the heart and lung. In Dr. Gerber's opinion, the heart and lung injuries would have caused "spurting blood coming from some of these wounds at the time of the act, so that it would be impossible to conceive that somebody would not have some blood on them ***." Although Dr. Gerber was unable to establish the exact date and time that Smith had been murdered, he estimated, based on the body's decomposition, that she had died on May 28 sometime in the afternoon. Given the extent of the injuries, Dr. Gerber opined that a strong person had attacked Smith, and that it was likely that she died within an hour of being attacked. Finally, Dr. Gerber testified, based on the lividity and the lack of blood where the body was found, that Smith had originally been lying face down with her buttocks above her face, and that her body had probably been moved after her death.

11

Lieutenant Steven Crowe and Detective John Patrick were the lead investigators assigned to Smith's murder. According to Detective Patrick, Neeley quickly became a suspect because Neeley was Smith's former boyfriend, and because Neeley had a prior conviction in Kentucky for first-degree assault and had been sentenced to serve ten years in prison, which had been suspended due to an appeal bond.

Smith and Neeley had dated for about seven years and had previously lived together with Smith's daughter from a previous marriage. Their home was located on Ivanhoe Avenue, in Norwood, which is about six-tenths of a mile from Millcrest Park. Smith had moved out in April 1994, after she had broken up with Neeley. At the time of her disappearance, Smith had been living with Julie Watkins and her husband, Steven, at their trailer home in Greenbrier Estates, which is located in Clermont County.

Neeley's home was searched on June 2. During the first search, a pair of jeans and two knives were recovered. Testing of the knives established that they did not contain any trace of human blood. A second search of Neeley's house was conducted on July 22, and some torn-up photographs of Smith and her family were found in the wastebasket. On June 2 and 3, a trained police dog conducted a search of Millcrest Park. Using the jeans found at Neeley's home, the dog was able to track a scent from the jeans to a site near the wooded area of the park. The dog was also able to track the scent found on the underwear found in Smith's car to a site near the wooded area. But the dog was unable to track the scent of Smith's purse.

The officers spoke with Neeley several times about his relationship with Smith. On June 1, Neeley told Lieutenant Crowe that he had last spoken with Smith on May 27, when he had informed Smith that he could not meet her on May 28 "because he was leaving earlier than expected for Kentucky." On June 4, both Detective Patrick and Lieutenant Crowe spoke with Neeley at his parent's home in Kentucky. During that conversation, Neeley informed the officers that he had stopped at a United Dairy Farmer's store (UDF) in Norwood on the morning of May 28 before going with his sister to stay at his family's home in Kentucky. Neeley also informed the officers that he had last

12

spoken with Smith by phone at 5:00 a.m. on May 28. On July 9, Detective Patrick spoke with Neeley about his alibi. Detective Patrick told Neeley that he could not have been at the UDF on May 28, because Patrick had reviewed the store's surveillance tapes and had found that Neeley was not portrayed in them. Confronted with the reasons supporting Detective Patrick's belief, Neeley denied being at the UDF on May 28. The police spoke with Neeley for the final time on July 18, and Neeley indicated that the last time he had seen Smith was on May 26.

In the months preceding Smith's disappearance, she had several unfortunate encounters with Neeley. On May 1, Officer Matthew Wurtz had arrested Neeley for the reckless operation of his pickup truck at Greenbrier Estates and for the aggravated menacing of Smith. In speaking with Officer Wurtz, Smith had indicated that she was afraid that Neeley would "kill her."

On May 2, Neeley had attempted to drive Smith off the road after meeting her at a UDF in Newtown, Ohio. A UDF employee had called the police. Neeley was charged with domestic violence and was arrested on May 3. A temporary restraining order was issued against him for Smith's protection. At a preliminary hearing relating to this event, Neeley told Smith that he was not worried about the domestic-violence charges because "she wouldn't be there to testify." The record establishes that, had Neeley been convicted for the three misdemeanors in Clermont County, his appellate bond in Kentucky would have been revoked and he would have been required to start serving his ten-year suspended sentence.

On or about May 20, Smith confided to a coworker, Christopher Lipscomb, that she was afraid of Neeley. On May 26, 1994, Patricia Rankin overheard a conversation between Smith and Neeley during which Neeley had yelled, "If you [Smith] go [to court on Monday] I'm going to kill you, bitch ***."

Jerry Burchett, a neighbor, testified that he had a conversation with Neeley about Smith sometime in May 1994, and that Neeley had indicated that Smith deserved to die. In a sworn statement given to the

13

police, Burchette used stronger language to describe his conversation with Neeley, indicating that Neeley had stated that he would kill Smith or "have it done."

On May 27, the day before Smith disappeared, Neeley apparently attempted to contact Smith at her mother's home, her sister's home, and a local bowling alley. Julie Watkins spoke to Neeley during one of those attempts. According to Watkins, Neeley had called Smith to arrange a meeting so that they could "sign some papers."

During the evening on May 27, Smith was with her coworker, Larry Jones, at a local bowling alley. According to Jones, he had spoken with Neeley over the telephone. After Jones informed Neeley that Jones was Smith's "boyfriend," Neeley became enraged. Jones further testified that, after the phone call, Smith and Jones had left the bowling alley, gotten some food, and had sexual relations in the back of Smith's car. Smith dropped Jones off at the bowling alley around 10 p.m. According to Julie and Steven Watkins, Smith had returned home around 1:30 a.m.

The evidence concerning Smith's whereabouts on May 28, was partly circumstantial. Julie and Steven Watkins both testified that, when they awoke at 10:20 a.m., Smith was gone, but that there was a message from Smith's daughter that her mother had not picked her up from school as planned. In Julie Watkins's estimation, she believed that her sister had left her house around 7 a.m.

At 7:40 a.m., Neeley and Smith were seen together near Millcrest Park. Donna Gillespie Long was on her way to work when she drove past two individuals whom she later identified as Smith and Neeley. According to Long, a bigger-boned, blonde-haired woman wearing a white top had been standing near a blue Corsica that was stopped at the side of the road. The woman was yelling at a man whom she identified as "David" to get back into the car. Long testified that the man had blonde hair, was clean-shaven and was wearing a blue plaid shirt with blue jeans.

Between 9:00 and 11:00 a.m., various witnesses saw both Neeley

14

and Smith at Neeley's residence. Patricia Manning, a neighbor, testified that she had seen Smith, who was wearing a white shirt, sitting in her car talking with Neeley's sister, Donna Hayes. Jerry Burchette testified that, at about 9:00 or 10:30 a.m., he had seen Neeley's truck and a Dodge Omni in Neeley's driveway, and that the door to the house was open. Lois Burchette, Neeley's neighbor, testified that around 11:00 a.m., she had seen Neeley's pickup truck, Hayes's car (an Omni), and Smith's car in Neeley's driveway. Mary Hoskins, Smith's mother, testified that she had driven by Neeley's home around 10:30 or 11:00 a.m. and had not seen Smith's car, but that she noticed that the house appeared to be open. Julie Watkins drove by Neeley's home around 11:30 a.m. and noticed that the house was open.

Between 11:00 a.m. and 1:00 p.m., Neeley and Smith were both seen at Millcrest Park. Charlotte Riggs, who was at the park for a church picnic, testified that she had observed a blonde-haired woman wearing a white top and jeans, with no shoes, standing near restrooms. According to Riggs, the woman looked like she had been wrestling with someone. Riggs also testified that, around 12:30 or 1:00 p.m., she had observed a man walking alone towards the ballpark. According to Riggs, the man was clean-shaven, had light brown hair and a tattoo, and was wearing a dark T-shirt. Riggs testified that, in her opinion, the man looked angry. Riggs also observed a white car in the parking lot. Riggs later identified the man and the woman she had seen at the park as Neeley and Smith.

Cindy Norman was also at the park with Riggs on the church picnic. Norman observed a woman with blonde hair, wearing a white outfit and no shoes, near the bathrooms in the park. Norman also saw a man leaving the park alone around 12:40 p.m. The man was wearing a plaid shirt, looked dirty, and had long, dark-brown hair that was "messy." Norman also observed a white car in the parking lot. When questioned by police three years later, Norman was able to identify Smith and Neeley as the two individuals she had observed at the park.

Around noon, Neeley's neighbor, Mike Hager, saw Neeley walking towards his house. According to Hager, Neeley was wearing jeans and a T-shirt, and carrying a light colored shirt on his arm. Hager

did not notice any blood or dirt on Neeley. Hager testified that, around the same time, he had also seen Hayes's car in Neeley's driveway. While Hager did not see Neeley after May 28, Hager testified that he had observed two people get something from Neeley's truck on May 31.

Around 12:30 p.m., Julie Watkins and Mary Hoskins drove by Neeley's house and noticed that Neeley's door was closed.

Only Fredrick and Peggy McQueen testified on behalf of Neeley at trial. Essentially, they each testified about Neeley's good character, and that, when they had seen him on May 29, 1994, he had black hair and a full beard.

(Doc. 4, Ex. 7).

In support of his insufficiency of evidence claim, petitioner first asserts that the prosecution failed to prove that Judy Smith was killed in Hamilton County. Ohio law requires that the venue of the crime be shown to be in the county of trial. *See Truesdale v. Dallman*, 690 F.2d 76, 77 (6th Cir. 1982). While venue is not a material element of any offense charged, it is a fact that must be proven beyond a reasonable doubt at trial unless waived. *State v. Jalowiec*, 744 N.E.2d 163, 173-174 (Ohio 2001); *State v. Draggo,* 418 N.E.2d 1343, 1345 (Ohio 1981); *see Truesdale*, 690 F.2d at 77. It therefore appears that the *Jackson* sufficiency of evidence standard applies to the issue of venue. *See Truesdale*, 690 F.2d at 78-79; *Jalowiec*, 744 N.E.2d 163, 173-174.

Petitioner bases this claim on the testimony of Detective Alderucci and Dr. Gerber who stated that the body had been moved to the location where it had been found because there was no blood around the area or broken branches evidencing a struggle and the mud found on the body was not from the surrounding area. (Doc. 13, Tr. 839,840-841, 852; Doc. 22, Tr. 33). The Ohio Court of Appeals determined that venue was established based on the circumstantial evidence that the victim was last seen alive in Millcrest Park, located in Hamilton County (Doc. 13, Testimony of Riggs and Norman, Tr. 701, 715, 731, 740) and that her car, body, and purse were also found in the park. (Doc. 4, Ex. 7 at 10-11). Although the actual crime scene was never uncovered by police, despite an extensive search of the park (Doc. 13, Tr. 842), this Court notes that Detective Alderucci and Dr. Gerber never testified that Judy Smith was not murdered in the park, but only that the murder did not take place in the

16

exact place where her body was found. (Doc. 13, Tr. 839,840-841, 852). Accordingly, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the crime occurred in Hamilton County.

Petitioner further argues that there was insufficient evidence presented to establish that the victim's body was that of Judy Smith, the victim named in the indictment. The Ohio Court of Appeals noted that the identity of the body recovered was never at issue at trial. (Doc. 4, Ex. 7 at 10). The Court indicated that the opal ring found on the body apparently belonging to Ms. Smith (Doc. 13, Tr. 862, 1091, 1188), the absence of shoes which Ms. Smith did not like to wear (Doc. 13, Tr. 488, 539, 702), and that the body "resembled Smith in height, weight, and clothing" (see Doc. 13, Tr. 497; Doc. 22, Tr. 12) was sufficient evidence to identify the body as Ms. Smith. (Doc. 4, Ex. 7 at 10). At trial, Lieutenant Crowe testified that in the missing persons report filed with the police, the family of Judy Smith indicated that she had an opal turquoise ring as a means of identifying her. (Doc. 13, Tr. 1188). The ring was on her hand when the body was discovered by police. (*Id.*). Moreover, although the coroner did not explain how the body was identified as that of Judy Smith, he testified that the body was, in fact, identified as that of Ms. Smith. (Doc. 22, Tr. 11). While there was no evidence that dental records or the victim's fingerprints had been analyzed to determine identity, the circumstantial evidence when viewed in the light most favorable to the prosecution was such that any rational trier of fact could have concluded beyond a reasonable doubt that the body was that of Judy Smith.

Petitioner next argues that there was no evidence that he killed anyone. The Ohio Court of Appeals addressed petitioner's claim, as follows:

Finally, although there was no direct physical evidence linking Neeley to Smith's murder, we cannot say that the circumstantial evidence presented by the prosecution was insufficient to prove that he committed aggravated murder. The elements of aggravated murder under R.C. 2903.01(A) required proof that Neeley had "purposely, and with prior calculation and design, cause[d] the death of [Smith]***."

The prosecution presented evidence demonstrating that Smith and Neeley were seen together early in the morning on May 28, 1994, and that Smith had been seen at Neeley's home later that morning. Further, there was testimony that, around noon, Smith was last seen at Millcrest Park

17

looking disheveled. Neeley was also at the park around that time, but he was seen leaving the park, a little while later. The prosecution also presented evidence that Smith was reported missing on May 28, 1994, and that her body was found at Millcrest Park several days later. According to the coroner, Smith had died from multiple stab wounds, and, based on the body's lividity, she had been dead for several days.

Evidence was also presented to show that Neeley had been charged with aggravated menacing and domestic violence against Smith, and that a temporary protection order had been issued against Neeley for Smith's protection. Further, there was evidence that Neeley had threatened to kill Smith on several different occasions. While the evidence was largely circumstantial, we remain convinced that was sufficient to persuade a trier of fact that the elements of aggravated murder were proved.

(Doc. 4, Ex. 7 at 11).

In this case, the State proved the aggravated murder charge based on circumstantial evidence. The prosecution showed that Neeley had the intent, the motive and the opportunity to murder Judy Smith. Petitioner demonstrated his intent to kill Judy Smith through his actions and words in the month preceding her death. On May 1, 1994, petitioner followed Ms. Smith into the trailer park where she had moved to live with her sister and her family. (Doc. 13, Tr. 462, 465). Ms. Smith and petitioner argued and she asked him to leave. (*Id.*, Tr. 469). Petitioner left, but then soon returned, driving recklessly and at high speeds through the park. (*Id.,* Tr. 470). Petitioner and Ms. Smith argued again. (*Id.,* Tr. 470). When Mrs. Watkins, the victim's sister, asked petitioner to leave, he refused. (*Id.,* Tr. 471). Three other vehicles surrounded petitioner's car and the police were called. (*Id.,* Tr. 471, 417). Ms. Smith relayed to the police that she was afraid that petitioner would kill her. (*Id.,* Tr. 424). Petitioner was arrested for aggravated menacing and reckless operation of a motor vehicle. (*Id.,* Tr. 421, 471).

On May 2, 1994, after Ms. Smith and her daughter had moved out of petitioner's home, she and the petitioner had arranged to meet at a United Dairy Farmer's store (UDF) so that petitioner could give her a child support check he received from her former husband. (Doc. 13, Tr. 373, 375, 376, 378, 473-474). Mr. Watkins, Ms. Smith's brother-in-law, followed her in his car in case she needed his help. (Doc. 13, Tr. 378, 474). After the transaction was completed, petitioner followed Ms. Smith and

18

while driving at a high speed, slammed his car into the victim's twice, making her lose control of her car temporarily. (*Id.,* Tr. 378-379).  Mr. Watkins attempted to get between them in his own car. (*Id.*, Tr. 379).  After this incident, Ms. Smith went into a UDF to call the police.  (*Id.*, Tr. 381, 407).  She was crying and uttering that petitioner was going to hurt her.  (*Id.,* Tr. 407). Petitioner followed her and turning to Mr. Watkins petitioner said "[s]ome bodyguard you've got." (*Id.,* Tr. 381).  Once learning that the police were on their way, petitioner sped away.  (*Id.,* Tr. 409). Petitioner was charged with domestic violence and a temporary protection order was issued against him.  (*Id.,* Tr. 381, 435).

On May 11, 1994, Mrs. Watkins and Ms. Smith attended a pretrial conference in the state trial court in Clermont County.  (*Id.,* Tr. 475). The case involving petitioner was continued until June 1, 1994. (*Id.*).  Mrs. Watkins testified that on the way out of the courtroom, Ms. Smith indicated to petitioner that she was not dropping the charges. (*Id.,* Tr. 477).  Petitioner retorted that "he wasn't worried about it, she wouldn't be there to testify." (*Id.*).

Petitioner again threatened Ms. Smith on May 26, 1994.  (Doc. 13, Tr. 531, 540). Petitioner telephoned Ms. Smith at her place of employment, a tanning salon.  (Doc. 13, Tr. 535). When Ms. Smith indicated that she would testify against petitioner, the owner of the salon who was sitting next to Ms. Smith, heard petitioner yell twice: "If you go, I'm going to kill you, bitch." (Doc. 13, Tr. 535).

Also on May 26, over drinks at the home of a neighbor, Mr. Burchette, petitioner stated referring to Ms. Smith that "he would kill the bitch or have it done." (Doc. 13, Tr. 554, 565, 575).

Petitioner's threats to kill or eliminate Ms. Smith made on three separate occasions, combined with his efforts to harass and scare her at her sister's home and his attempts to run her off the road, all occurring in the month in which she was murdered, was compelling evidence of petitioner's intent to murder Ms. Smith.

As petitioner correctly argues, the state failed to introduce the testimony of eyewitnesses who saw the murder committed, a confession by petitioner, or physical and forensic evidence proving the involvement of petitioner. (Doc. 4, Ex. 5 at 9). The police did not find the murder weapon or any blood stained clothing belonging to the perpetrator.  What the  state did prove was that petitioner and the victim were present at Millcrest Park where the victim's body was found on the day that she was reported

missing.

At 7:40 a.m., Donna Gillespie Long observed a blonde woman of approximately five foot five inches in height, tell a man she called David to get back into a car near Millcrest Park. (Doc. 13, Tr. 632, 636, 639). The man was dressed in a plaid shirt and jeans, clean shaven with blond hair and seemed angry. (Doc. 13, Tr. 642). Ms. Long identified petitioner in the courtroom at trial and in a photo array in June of 1994, claiming that she was certain that he was the man she saw in the park. (*Id.,* Tr. 649, 651). She also identified Ms. Smith from family photos. (*Id.*, Tr. 653). Later that morning at 9:30 a.m., a neighbor of petitioner's witnessed Ms. Smith talking to petitioner's sister outside petitioner's home (Doc. 13, Tr. 676-679).

While attending a church picnic in Millcrest Park on May 28, Mrs. Riggs first observed a blond lady, of medium build, wearing a white blouse, jeans and no shoes by the park restrooms. (Doc. 13, Tr. 702-703). Mrs. Riggs testified that the woman looked like she had been wrestling, as she was dirty and disheveled. (Doc. 13, Tr. 703). At 12:30 or 1:00 p.m., she noticed an angry looking man walk from the bathroom towards the ball park. (Doc. 13, Tr. 704). She described him as five foot eight inches with a medium build, a tattoo, light brown hair, clean shaven and wearing a tee shirt. (Doc. 13, Tr. 707, 708, 716). Mrs. Riggs expressed concern that the man was heading for the children in the park. (*Id.*, Tr. 710). On July 30, 1994, she too identified both the petitioner and the victim from a group of photographs and then also identified petitioner at trial. (*Id.*, Tr. 715). Mrs. Norman, also at the church picnic, ran into a blond women with white clothes and no shoes leaving the park restroom. (Doc. 13, Tr. 731). Later she noticed an angry man with a plaid shirt and messy hair leaving the park. (*Id.*, Tr. 731, 733, 736). Three and one-half years later, Ms. Norman identified petitioner in a photo array and also identified him at trial. (Doc. 13, Tr. 741). She explained that she remembered his appearance after all that time because he scared her. (Doc. 13, Tr. 741). Both Mrs. Norman and Mrs. Riggs recalled seeing a white car, which did not belong to a church member in the parking lot. (*Id.*, Tr. 705, 732). Ms. Smith's car, a white Chevrolet Lumina, was found in the park at the time of her death. (*Id.*, Tr. 400, 755-756). Mr. Hager, a neighbor of petitioner's, testified that at noon on May 28, 1994, he saw petitioner walking towards his house carrying a shirt draped over his arm. (*Id.*, Tr. 1070).

There were discrepancies and inaccuracies in the descriptions given by these witnesses of petitioner, for example, petitioner does not have a tattoo (*id.*, Tr. 922) and apparently has dark hair (*id.*, Tr. 663). Also, there is conflicting evidence on the record

as to whether petitioner was clean shaven as Mrs. Long and Mrs. Riggs testified.  Two of his neighbors and his sister and brother-in-law testified that he had a beard (*id*., Tr. 692-693, 1076, 1199, 1204), but the police officers interviewing him in early June testified otherwise , as did one of Ms. Smith's co-workers (*id*., Tr. 961, 1117, 619).  What makes the identification of petitioner particularly reliable is that despite the discrepancies and inaccuracies in their descriptions, Mrs. Riggs, Norman and Long, the witnesses who placed petitioner at the scene, all identified petitioner out of a photo array and later identified him in court.   While they testified either that he did not have a beard or in the case of Mrs. Norman that she did not know whether he had a beard (*id*., Tr. 747), the witnesses picked a photo of petitioner in which he was in fact bearded (*id*., Tr. 747, 711, 657).

The relationship between Ms. Smith and the petitioner had become very strained. Ms. Smith moved out of petitioner's Norwood home in March or April of 1994 after a seven year relationship and apparently, he wanted her to return home.  (Doc. 13, Tr. 489, 593-594). Ms. Smith had difficulty getting her clothes from his home and required police intervention to facilitate their removal.   (Doc. 13, Tr. 465-466, 752).   She expressed her fear of petitioner to police, family, and coworkers during the month before her death   (Doc. 13, Tr. 407, 424, 527, 605, 795).   On the night before her disappearance, Mr. Jones, Ms. Smith's coworker, called petitioner and tantalized him by indicating that he was now her boyfriend and by commenting favorably on her sexual prowess.   (Doc. 13, Tr. 607-708).   By his words and actions, petitioner demonstrated his frustration about his failed relationship and his intense anger toward Ms. Smith.   Petitioner's expressed motive for killing her was preventing her from testifying against him.  Mr. Jones' phone call on the night of May 27 provided him with a final provocation for his criminal act.

Petitioner's actions after Ms. Smith's murder demonstrated a consciousness of guilt.  First, petitioner lied to police about his whereabouts the morning of the murder. He told them he went to the UDF to purchase cigarettes, but petitioner was not seen on the store videotape nor was his purchase recorded on the register tape for that day. (Doc. 13, Tr. 957-958, 1036).  Second, petitioner did not attend Ms. Smith's funeral. (Doc. 13, Tr. 486). Finally, petitioner left for Kentucky on the day of Ms. Smith's disappearance.  (Doc. 13, Tr. 960, 1072, 1122).

The State presented strong evidence of petitioner's intent to kill Ms. Smith and his angry and agitated state of mind in the month before her murder. The prosecution also called eyewitnesses who placed petitioner and Ms. Smith at the park on the day she

21

was reported missing and where her body was discovered. While petitioner was observed leaving the park and heading toward his home that day, Ms. Smith was never seen alive again. In addition, there was ample evidence of petitioner's motive to commit this crime, mainly his desire that Ms. Smith not testify against him, but also his frustration and anger at a failed relationship and his jealousy that she was with another man. After viewing the evidence in the light most favorable to the prosecution, *any* rational jury could have found that the natural inferences drawn from these facts were that petitioner purposely caused the death of Ms. Smith beyond a reasonable doubt.

Petitioner also challenges the adequacy of the state's proof with respect to the element of "prior calculation and design." [2] Prior calculation and design involves "studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.[3] *State v. Jones,* 744 N.E. 2d 1163, 1176 (Ohio) (quoting *State v. Taylor,* 676 N.E.2d 82, 88 (Ohio), *cert. denied,* 522 U.S. 851 (1997)), *cert. denied,* 534 U.S. 1004 (2001). While the amount of care or time that the perpetrator takes to plan the crime are not determinative factors, there must be more than "momentary deliberation." *Id.* To determine whether a killing occurred with prior calculation and design under Ohio law, the trier of fact must examine the "context in which the killing occurred." *State v. Jenkins,* 355 N.E.2d 825, 828 (Ohio 1976). Some of the factors to be weighed and viewed under the totality of all circumstances of the homicide include:

> whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events.

---

[2]Petitioner did not specifically raise this claim in his state court appeal, and for that reason, the Ohio Court of Appeals did not address this issue in its opinion. (*See* Doc. 13, Exs. 5, 7). However, because respondent failed to raise a defense of waiver based on procedural default in the state courts (*see* Doc. 4), this Court will address the merits of the claim.

[3]Prior calculation and design is considered a "single, indivisible term" describing the state of mind element necessary to support an aggravated murder conviction, not two separate elements of aggravated murder. *State v. Taylor,* 676 N.E.2d 82, 88 (Ohio), *cert. denied,* 522 U.S. 851 (1997).

*Id.* A defendant's threats to kill the victim, especially repeated threats, may be considered evidence of prior calculation and design. *Jones,* 744 N.E. 2d at 1177; *State v. White*, 693 N.E.2d 772, 779-780 (Ohio 1998); *State v. Hutton,* 559 N.E.2d 432, 440 (Ohio 1990); *Gaines,* 2003 WL 22966190, at *10; *State v. McClutchen,* No. 81821, 2003 WL 22099442, at *5 (Ohio Ct. App. Sept. 11, 2003), *appeal not allowed,* 802 N.E.2d 154 (Ohio 2004); *State v. White,* No. 95CA08, 1996 WL 614190, at *5 (Ohio Ct. App. Oct. 21, 1996).

In this case, the state proved both that the victim was known to petitioner and that the relationship was strained. While there was no evidence as to whether petitioner considered the weapon to be used or the site of the crime, there was evidence that the location where Ms. Smith's body was found, Millcrest Park, was a place where petitioner and the victim had arranged to meet on previous occasions. (Doc. 13, Tr. 796-797, 972,809). Moreover, there was substantial evidence that petitioner had been trying to reach the victim on the evening before her death. (Doc. 13, Tr. 478-479, 582, 605, 606, 781). For example, he called her sister, saying that he needed to meet with Ms. Smith the next day. (Doc. 13, Tr. 478-479). Mrs. Watkins informed the victim that petitioner had called when she came home at 1:00 or 2:00 a.m. on May 28 and Ms. Smith returned the call. (*Id.*, Tr. 479, 480). Petitioner conceded in his pretrial interviews with police that he had spoken by phone with Ms. Smith in the early morning hours of May 28, but he explained that the call was for the purpose of cancelling their meeting the next morning. (Doc. 13, Tr. 953, 984, 1122). Thus, there was some circumstantial evidence that petitioner had planned to meet with petitioner on the day she was reported missing although he claimed to have aborted his plans.

With respect to the final factor, the spontaneity of the crime, petitioner's two threats to Ms. Smith and statement to Mr. Burchette of his intent to kill her, as well as his violent and reckless behavior towards Ms. Smith, weeks and days before her murder, evidence that petitioner was planning to kill her over a period of time and that his act was not spontaneous. The fact that Ms. Smith had forty stab wounds to her body also suggests that there was a plan to end her life, rather than a momentary decision to kill her. *Cf. Hutton,* 559 N.E.2d at 440 (repeated threats against a victim's life combined with multiple gunshot wounds are strong evidence of prior calculation and design); *White*,1996 WL 614190, at *5 (same).

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that petitioner acted with prior calculation and design when he murdered Ms. Smith.

In sum, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that petitioner committed the aggravated murder of Judy Smith beyond a reasonable doubt. Accordingly, this Court concludes that the ruling of the Ohio Court of Appeals on the sufficiency of evidence with respect to this crime comports with the United States Supreme Court's *Jackson* standard and was based on a reasonable assessment of the facts in light of the record evidence. Petitioner is therefore not entitled to habeas corpus relief with respect to his insufficiency of evidence claim, asserted in ground one.

### II. Petitioner is not entitled to habeas corpus relief with respect to his prosecutorial misconduct claim, asserted in his second ground for relief.

### A. Prosecutorial Misconduct during Closing Argument

In his second ground for relief, petitioner argues that prosecutorial misconduct denied him a fair trial. In support of his claim, petitioner alleges that in closing argument the prosecutor relied on facts not in evidence and mischaracterized the evidence. (Grounds 2 (1) - (3)).

"The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982). Although preliminarily the court confronted with a prosecutorial misconduct claim must determine whether the prosecutor's conduct was improper, that is not sufficient to amount to a due process violation. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 179-180 (1986). Where no specific constitutional right is alleged to have been infringed by the prosecutor's conduct , a claim of prosecutorial misconduct is one of ordinary trial error that does not rise to the level of a constitutional violation unless the misconduct "so infected the trial with unfairness as to render the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-643 (1974); *see also Darden,* 477 at 181. The prosecutor's challenged conduct must be examined within the context of the entire trial to determine whether it deprived the defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11-12 (1985); *see also Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. 1982) (en banc).

Factors to be considered in weighing prosecutorial misconduct claims are: (1) the degree to which the challenged conduct has a tendency to mislead the jury and to prejudice the accused, *see Darden,* 477 U.S. at 182, *Young,* 470 U.S. at 12 ; (2) whether

the conduct is isolated or extensive, *see Donnelly,* 416 U.S. at 646; (3) whether the conduct is deliberate, *see id.* at 647; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182; *Berger v. United States,* 295 U.S. 78, 84-85 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212 (1960); (5) the strength of the competent proof to establish the guilt of the accused, *see Darden,* 477 U.S. at 182; (6) whether the conduct was objected to by defense counsel, *see id.* at 182-183 & n. 14; *Young,* 470 U.S. at 13; and (7) whether a curative instruction was given by the trial judge, *Darden,* 477 U.S. at 182.  *See also Farmer v. Hofbauer,* No. 99-2040, 2001 WL 45475, at *3-*4 (6th Cir. Jan. 10, 2001); *Givens v. Yukins,* No. 98-2429, 2000 WL 1828484, at **6-**7 (6th Cir. Dec. 5, 2000); *Gordon v. Kelly,* No. 98-1905, 2000 WL 145144, at **7 (6th Cir. Feb. 1, 2000); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.) (citing *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *cert. denied,* 510 U.S. 1201 (1994)), *cert. denied,* 522 U.S. 1001 (1997).

The cases of *Darden v. Wainwright,* 477 U.S. 168, 179-180 (1986) and *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-643 (1974) provide examples of how the United States Supreme Court applies these factors. In *Darden v. Wainwright,* 477 U.S. 168, 179-180 (1986), the United States Supreme Court declined to find a due process violation when the prosecutor made improper comments in his closing argument including calling the defendant an animal, implying that the death penalty was the only guarantee against defendant's future acts, blaming the Division of Corrections because defendant was on a weekend furlough when the crime occurred and making offensive comments reflecting an emotional reaction to the case.  The Supreme Court was persuaded that petitioner's trial was a fair one because the prosecutor's argument did not manipulate or misstate the evidence, the prosecutor's comments were responsive to the opening summation of the defense, the court gave an instruction that the decision was to be made on the basis of the evidence alone and  not on counsel's argument, the weight of the evidence against petitioner was heavy and the defense counsel had an opportunity to rebut the prosecution's improper arguments and did so effectively. 477 U.S. at 181-182.  In *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-643 (1974), the prosecutor stated in closing argument that the defendant hopes that the jury finds him guilty of a lesser offense, which the First Circuit Court of Appeals on habeas corpus review concluded implied that petitioner had unsuccessfully sought to plead to a lesser charge.  416 U.S. at 640.  Because the remark was ambiguous, was "but one moment in an extended trial," and was followed by an instruction that the statement could not be considered as evidence, the Supreme Court ruled that the comment did not deny petitioner due process.  *Id.* at 644-645.

In this federal habeas corpus proceeding challenging a state conviction, the Court may not grant relief based on a constitutional trial error committed during the state trial unless that error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (per curiam) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (which adopted the standard of review enunciated in *Kotteakos v. United States,* 328 U.S. 750 (1946), for federal habeas review of state convictions)). Under *Brecht,* if the court is convinced upon review of the entire record that "the error did not influence the jury, or had but slight effect," the conviction must stand. *See Kotteakos,* 328 U.S. at 764; *see also Barker v. Yukins,* 199 F.3d 867, 874 (citing *O'Neal v. McAninch,* 513 U.S. 432, 435-38 (1995)), *cert. denied,* 530 U.S. 1229 (2000). On the other hand, if the court "is left in grave doubt" and "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," the court must find that the error had substantial influence on the jury and the conviction cannot stand. *Kotteakos,* 328 U.S. at 765; *see also O'Neal,* 513 U.S. at 436; *Barker,* 199 F.3d at 873-74.

Claims of prosecutorial misconduct must meet the *Brecht* standard to warrant habeas corpus relief. *Gordon v. Kelly*, 2000 WL 145144, at **12; *Hensley v. McGinnis,* No. 98-1675, 1999 WL 685932, at **3-4 (6th Cir. Aug. 25, 1999).

As his first instance of prosecutorial misconduct in closing argument, petitioner alleges that the state argued incorrectly that petitioner had arranged to meet the victim in Millcrest Park where her body was found on the day she was reported missing. (Ground 2 (1)). During the argument, the following  references are made by the prosecution to petitioner's alleged plans without objection by the defense:

1.    Neeley continues to call and told the police he even called that morning around five in the morning on May 23 to try to get hold of Judy, because he wanted to make sure that Judy would meet him in Millcrest Park. (Doc. 13, Tr. 1258).

2.  His prior calculation and design is proven by the fact that he calls her repeatedly to set up a meeting with her in Millcrest Park. (*Id*., Tr. 1259).

The prosecution then argues that to acquit petitioner, the defense would have to convince the jury that there were "an incredible number of wild coincidences in this case." (*Id*., Tr. 1260).  He includes the following:

26

Number 3, the fact that Judy was killed and found at Millcrest park, which just so happens to be Neeley and Judy's meeting place, they want you to believe that that's just a coincidence. Out of all the places in Hamilton County, just happens that she is found there. (*Id*., Tr. 1261).

. . .

The fact that Neeley, by his own statements to police, he told police that he had planned to meet Judy in Millcrest Park. The fact that he planned to meet her that very day. (*Id*., Tr. 1261-1262).

Finally, defense counsel objected on the ground that this was not in evidence. (*Id*., Tr. 1262). The trial court, then, instructed the jury:

Ladies and gentlemen of the jury, you must decide what the evidence is. Obviously counsel has divergent views of what the evidence is, it doesn't make any difference.

As he told you, final argument is not evidence, it's only their opinions. You are the ones that decide what the facts are in this case, that's your province.

(*Id*.). The prosecutor proceeded to repeat his prior statement, saying "The fact that he planned to meet her that day, that's apparently just another wild coincidence." (*Id*.).

The Ohio Court of Appeals first determined that the prosecutor's comments were improper on these grounds:

The record is clear that Neeley had told Lieutenant Crowe that he was not planning on meeting Smith on May 28, because he was going to leave for Kentucky earlier than previously planned. Furthermore, while some evidence may indicate that Neeley and Smith had planned to meet on May 28, the evidence does not establish that Smith and Neeley had planned to meet in Millcrest Park. As there is no evidence suggesting that Neeley and Smith had planned to meet at Millcrest Park on May 28, the assistant prosecutor's comment was clearly improper.

(Doc. 4, Ex. 7 at 14). Since the evidence of guilt was sufficient to sustain the jury's

verdict and a curative instruction was provided, the Ohio Court of Appeals concluded that the comments were not prejudicial. (*Id.* at 17).

It is improper for the state in closing argument to "bring to the attention of the jury any purported facts that are not in evidence and are prejudicial." *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001)); *see Berger,* 295 U.S. at 84. Although a prosecutor may argue reasonable inferences based on the evidence, *Byrd*, 209 F.3d at 535, he may not misstate the evidence, *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001). Because "a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty," *Washington v. Hofbauer*, 228 F.3d at 700 (citing *Berger,* 295 U.S. at 84), misrepresenting facts in evidence or asserting facts that were never introduced "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Donnelly*, 416 U.S. at 637.

This Court agrees with the Ohio Court of Appeals that the prosecution's comments were improper because the prosecutor mischaracterized the evidence and argued facts not in evidence to increase the probability that the jury would find the element of prior calculation and design. Lieutenant Crowe testified that petitioner told him that he called the victim on Friday night to inform her that he was not available to meet her in the morning because he had to leave early for Kentucky, not to arrange a meeting in the park, as the prosecution argued. (Doc. 13, Tr. 1122). While there was evidence that petitioner had made several calls to reach the victim that night, only Mrs. Watkins, the victim's sister, testified that petitioner indicated that he wanted to meet with the victim the next morning and she did not testify that he indicated the place of the meeting, as the prosecution stated. (Doc. 13, Tr. 478-479, 582, 605, 606, 781). The prosecution did introduce evidence that the couple had previously met to talk in Millcrest Park where the victim's body was discovered (Doc. 13, Tr. 796-797, 972, 809), but there was no direct evidence that petitioner was planning to meet her there on the day of her disappearance, as the prosecution argued.

In weighing the relevant factors to be considered in determining the presence of a due process violation, the court finds that at least four of the factors weigh in petitioner's favor. The prosecutor's conduct had a tendency to mislead the jury and prejudice the petitioner because it suggested that there was more evidence of planning on petitioner's part to support the prior calculation and design element of aggravated murder than the record actually contained. The comments were repeated at least four

28

times during the argument, so they were not isolated and the repetition leads to the conclusion that the comments were deliberate. Finally, the comments clearly misstated the evidence. Since defense counsel objected to one of the four comments but not to the others, this factor is inconclusive.

Two factors weigh heavily in the state's favor. First, the trial court provided a curative instruction immediately after one of the offending comments. Second, although the evidence in this case was certainly not overwhelming in that the evidence was circumstantial and there was no direct physical or forensic evidence linking petitioner to the murder, petitioner's own statements of his plan to kill the victim if she persisted in her intention to testify against him were strong evidence of both his intent to commit the crime and his planning for it. Conceding that the prosecutor's remarks were problematic, this Court nevertheless concludes that they did not deprive petitioner of a fair trial. The Court is convinced that the conduct at issue had at most, a slight effect on the verdict, and certainly did not have the kind of "substantial and injurious effect" necessary to grant petitioner's request for relief. *See Brecht,* 507 U.S. at 637.

Petitioner also challenges the following remarks of the prosecutor made during rebuttal closing argument as a mischaracterization of the evidence (Ground 2 (2)):

> The evidence suggests that the defendant hid the body where it wouldn't readily be found. And he came back up to Ohio, with a friend and remember, you are going to have the statement of Jerry Burchette in the jury room and he said that the defendant told him he was going to kill that bitch or have it done. And that he was going to load the body –
>
> Mr. Ancona: Objection, Judge, it's not a fair comment.
>
> The Court: Overruled.
>
> Mr. Tieger: – into her car with the keys that he kept, drive her back to Kentucky, and Judy Smith nor her car would ever [sic] be found again.
>
> Because at that point she's still just a missing person and there's no body. She wouldn't be found in the hills of Kentucky, out in the country where he's from.

(Doc. 13, Tr. 1326). The Ohio Court of Appeals concluded that the comment was

improper because Mr. Burchette did not testify in court or state in his affidavit that petitioner planned to hide the victim's body nor was there any other evidence presented on this issue. (Doc. 4, Ex. 7 at 16). The state court concluded that the comments did not deprive petitioner of a fair trial because of the sufficiency of the evidence of guilt. (*Id.*).

The prosecutor's comments concerning the victim's body are not based on facts in evidence and are therefore wholly improper. (*See* Doc. 13, Tr. 554, 561, 575). The factors which favor petitioner's claim are that this comment mislead the jury, misstated the evidence, was deliberate, and was objected to by the defense. The factors which weigh against petitioner's claim are the isolated nature of this comment, the sufficiency of the evidence, and the Court's instruction given several times during closing argument and as part of the jury charge, that the verdict was to be based on the evidence and that counsel's argument is not evidence. (Doc. 13, Tr. 1333, 1262, 1311 1320).

There is no excuse for such a blatant mischaracterization of the evidence and this Court is troubled by the prosecutor's behavior. However, under the circumstances of this case, his misstep does not warrant habeas corpus relief. During deliberations, the jury had the Burchette affidavit to review, and would have readily recognized the prosecution's gross misstatement of his testimony. In contrast to the evidence of petitioner's threats and reckless behavior preceding the victim's murder, the Court is persuaded that the prosecution's comments had but a slight effect on the verdict.

Petitioner also challenges the veracity of the prosecutor's assertion during closing argument that the victim was murdered in Millcrest Park (Doc. 13, Tr. 1261) because the state's witnesses testified that her body had been moved to the location where she had been found. (Ground 2 (3)). The Ohio Court of Appeals declined to address this claim because defense counsel failed to object to the comment.[4] The coroner and detective testified that the body had been moved to the area where Ms. Smith was found. As this Court has discussed with respect to its assessment of the sufficiency of evidence, they did not state that she was killed somewhere other than the park. The Ohio Court of Appeals determined, that her purse, car and body were all found in the park and she was last seen alive in the park. Accordingly, the prosecutor's statement that she was killed in the park is a reasonable inference from the evidence of record.

---

[4] Respondent failed to raise a waiver defense based on petitioner's procedural default in state court and accordingly, this Court addresses the issue.

As further error in the prosecutor's closing remarks, petitioner cites comments which he alleges violate his Fifth Amendment right not to testify at trial. (Ground 2 (4)).

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court found that the atmosphere of custodial interrogation in and of itself is inherently coercive and, to ensure that the Fifth Amendment privilege against self-incrimination is not undermined in such a situation, established certain procedural safeguards for counteracting the compelling pressures inherent in the custodial interrogation setting, including the requirement that the person being interrogated must be warned prior to questioning that he has the right to remain silent. *Miranda*, 384 U.S. at 444, 458. In addressing the need for the "right to remain silent" warning, the Court recognized the "inherent pressures" on persons in custody who are faced with an "interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue unless a confession is obtained *or that silence in the face of accusation is itself damning and will bode ill when presented to a jury*." *Id.* at 468 (emphasis added). The Court stated: "[T]he warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Id.* The Court further noted that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation," and, therefore, the prosecution may not "use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Id.* at 468 n.3; s*ee also Pennsylvania v. Muniz,* 496 U.S. 582, 615 n.3 (1990) ("A defendant's silence in response to police questioning is not admissible at trial" under *Miranda*.) In *Dickerson v. United States,* 530 U.S. 428, 444 (2000), the Supreme Court held that "*Miranda* announced a constitutional rule that Congress may not supersede legislatively."

In a line of analogous cases involving instructions given or comments made by the prosecutor on the defendant's refusal to testify at trial, the Supreme Court has held that the Fifth Amendment forbids the judge or the prosecutor on his own initiative from "suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *See United States v. Robinson,* 485 U.S. 25, 32 (1988) (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 319 (1976), and citing *Lakeside v. Oregon,* 435 U.S. 333, 338 (1978)); *see also Griffin v. California,* 380 U.S. 609, 615 (1965) ("the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"). In *Griffin,* the seminal case in this line of cases, the Court reasoned

31

that such comment on the refusal to testify violates the Fifth Amendment because it "is a penalty imposed . . . for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Griffin,* 380 U.S. at 614. The Supreme Court has refused to extend *Griffin*'s holding to cases where the defendant chooses not to remain silent and testifies in his own defense at trial. *See Jenkins v. Anderson,* 447 U.S. 231, 235-38 (1980) (citing *Raffel v. United States,* 271 U.S. 494 (1926)). In such cases, the Court has held the Fifth Amendment is not violated when the prosecutor uses the defendant's prior silence for impeachment purposes. *See Jenkins,* 447 U.S. at 235-36 & n.2; *see also Raffel,* 271 U.S. at 495-97.

*Doyle v. Ohio,* 426 U.S. 610 (1976) also involved defendants who chose to testify in their own defense at trial. In that case, the prosecutor was permitted to impeach the defendants' exculpatory version of events by asking them on cross-examination why they did not tell their story at the time of their arrest after receiving *Miranda* warnings. *Doyle,* 426 U.S. at 611-13. In considering the claims of error stemming from the prosecutor's actions on habeas review, the Supreme Court framed the issue as one of due process and notably did not address the contention that the State had violated the defendants' Fifth Amendment privilege against self-incrimination by using their post-arrest silence for impeachment purposes. *See Wainwright v. Greenfield,* 474 U.S. 284, 291 n.7 (1986). The Court held that the "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle,* 426 U.S. at 619. This holding rests primarily on the premise that because the *Miranda* warnings contain an implicit assurance that "silence will carry no penalty," it would be fundamentally unfair and a deprivation of due process to permit the prosecution to breach that promise and use the arrested person's post-*Miranda* silence as evidence against him at trial. *See Doyle,* 426 U.S. at 618-19; *see also Brecht v. Abrahamson,* 507 U.S. 619, 628-29 (1993); *Greer v. Miller,* 483 U.S. 756, 762-63 (1987); *Wainwright,* 474 U.S. at 290-92. In *Doyle,* the Court quoted with approval the following explanation given by Justice White in his opinion concurring in the judgment in *United States v. Hale,* 422 U.S. 171, 182-83 (1975):

> [W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need

not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case.

*Doyle,* 426 U.S. at 619.

In this case, petitioner identifies the following remark by the prosecutor as a comment on petitioner's right not to testify at trial in violation of the Fifth Amendment: "He is the only person that's refused to account for his whereabouts." (Doc. 13, Tr. 1325). The Ohio Court of Appeals concluded that the remark was improper because it "suggested an impermissible inference about Neeley's failure to take the witness stand." (Doc. 4, Ex. 7 at 15). Nevertheless, in light of the sufficiency of evidence and a curative instruction issued by the judge, the court determined that the comment was not prejudicial and sustained the assignment of error. (*Id.* at 17).

The prosecutor's comment appeared during the rebuttal closing argument in the following context:

Now, was the defendant truthful and honest and open with police when they tried to speak to him about their case? He was more than happy to talk about anything other than himself, and that in itself is telling.

He said that he talked to Judy Smith the night of May 27, but refused to say what they talked about. He said that he talked to Judy Smith that morning, but again refused to divulge the contents of that conversation.

He was unsure of what time he and his sister Donna left for Kentucky or when they arrived.

He said that he left home several times during the morning of May 28, but refused to give any details. He lied about being in UDF, and he refused to discuss anything regarding what he did May 28, other than drive to Kentucky with his sister Donna at an unknown time.

*He is the only person that's refused to account for his whereabouts.*

33

Mr. Ancona: Objection. Move for Mistrial.

The Court: Ladies and gentlemen, the defendant does not have to take the stand, nor does the defense have to prove anything.

Go ahead.

Mr. Tieger: Ladies and gentlemen, what I was referring to is in his statements to police he was the only person that refused to account for his whereabouts. He was very detailed about some things, but absolutely failed to disclose where he was that morning.

He was smart enough to know that the police would catch him in lies. Just like they did with the UDF story. The defendant had set off a series of events there was not turning back.

(Doc. 13, Tr. 1324-1325). When read in context, it appears to this Court that the prosecution was commenting about petitioner's statements to police during their pre-arrest interviews, as opposed to commenting about petitioner's failure to testify at trial. *Cf. State v. Jenkins,* No. 98-502 CA, 2000 WL 288658, at *9-10 (March 14, 2000) (context of statement made during closing argument suggests omission in defendant's pretrial exculpatory statement, not improper comment on failure to testify). Accordingly, this Court does not agree with the Ohio Court of Appeals assessment that the prosecutor's comment was an improper reference to petitioner's failure to take the stand.

The record further supports this interpretation of the prosecutions' comments. Detective Patrick testified that he and Detective Crowe interviewed petitioner on June 4, 1994 at petitioner's parents' home in Kentucky. (Doc. 13, Tr. 947). The parties stipulated that petitioner was advised of his Miranda rights. (*Id.*) Petitioner agreed to speak with detectives. (*Id.*). Over defense counsel's objection, Detective Patrick testified that petitioner advised him that he would not talk to them about any specific events occurring on May 28, the day Ms. Smith disappeared. (Doc. 13, Tr. 948, 950). Although Detective Crowe testified that petitioner would not indicate when he last saw the victim, he later testified that petitioner stated that he saw her on May 26 but would not reveal the subject of their conversation. (*Id.,* Tr. 951, 952). In response to when he last spoke with the victim by phone, petitioner indicated May 28 at 5:00 a.m. (*Id.,* Tr. 953*)*. Detective Patrick further testified that petitioner mentioned that he went to

34

UDF on Mentor Avenue that morning to purchase some cigarettes. (*Id.*, Tr. 957-958). When he tried to pin petitioner down as to where he was in Norwood on May 28, 1994, petitioner would not give him that information. (*Id.*, Tr. 962).

The detectives again interviewed petitioner in Kentucky on July 9. (*Id.,* Tr. 972). Petitioner conceded that he and Judy Smith had met at Millcrest Park in the past. (*Id.*). He refused to provide information as to the content of his conversation with the victim on the morning of May 28. (*Id.*, Tr.972-973). When confronted with his lie about his trip to UDF that day, he denied ever stating that he went there on May 28. (*Id.*, Tr. 974). When questioned again about his whereabouts on the morning of May 28, he answered that he left the house a few times, but refused to indicated where he went. (*Id.*).

On July 18, Detective Patrick interviewed petitioner in Norwood, a third time. (*Id.*, Tr. 984). While petitioner admitted to a conversation with Ms. Smith on May 28, he would not divulge the substance of the conversation. (*Id.*). When Lieutenant Patrick again questioned him about the morning of May 28, he refused to discuss it. (*Id.*, Tr. 985).

Throughout this testimony, trial counsel objected to the Officer's statements concerning petitioner's refusal to answer questions about his whereabouts on May 28. (*Id.,* Tr. 948, 950, 962, 973, 985). The trial judge permitted testimony concerning petitioner's refusal to answer questions about where he was on May 28, 1994 apparently on the authority of *State v. Gillard,* 533 N.E.2d 272 (Ohio 1988), *overruled on other grounds, State v. McGuire,*686 N.E.2d 1112 (Ohio 1997) . (*Id.,* Tr. 949). That case holds that once a defendant makes an exculpatory statement, testimony about his refusal to answer specific questions concerning the statement is not protected by *Miranda* or *Doyle* because he chose not to remain silent. 533 N.E.2d at 278. While there are federal cases which are in agreement with *Gillard*, *see United States v. Pitre*, 960 F.2d 1112, 1125-1126 (2nd Cir. 1992); *United States v. Harris,* 956 F.2d 177,181 (8th Cir., *cert. denied,* 506 U.S. 827 (1992); *United States v. Davenport,* 929 F.2d 1169, 1173-1175(7th Cir. 1991), *cert. denied,* 502 U.S. 1031 (1992), there are other cases which honor a selective waiver and hold that after answering some questions, the refusal to answer others is protected by *Miranda*, *see Kappos v. Hanks*, 54 F.3d 365, 368-369 (7th Cir. 1995); *United States v. Williams*, 665 F.2d 107, 108-109 (6th Cir. 1981); *United States v. Lopez-Diaz,* 630 F.2d 661, 664-665 (9th Cir. 1980).

The issue of whether or not the prosecutor's remark constitutes an improper

comment on petitioner's post-*Miranda* silence during a police interrogation, however, is not before this Court nor was it raised in the Ohio Court of Appeals and accordingly, this Court will not address the issue. Petitioner specifically bases his claim of error on the impropriety of the comment for the reason that it refers to the defendant's failure to testify at trial. Because this Court does not interpret the prosecutor's remarks as referring to petitioner's failure to testify, petitioner is not entitled to relief with respect to this alleged error.

Accordingly, the decision of the Ohio Court of Appeals rejecting petitioner's claims of prosecutorial misconduct in closing argument did not involve an unreasonable application of Supreme Court cases involving prosecutorial misconduct such as, *Darden* and *Donnelly,* and was not based on an unreasonable determination of the facts in light of the evidence presented (which would benefit petitioner[5]). Petitioner is therefore not entitled to habeas corpus relief based on his claims of prosecutorial misconduct in closing argument asserted in ground two of the petition.

## B. Brady Violations and the propriety of the trial court's rulings with respect to alleged discovery violations

In his second ground for relief, petitioner argues that the prosecution failed to provide him with information he requested in discovery. (Ground 2 (5)). In a related claim alleged in his third ground for relief, petitioner asserts that the trial court failed to respond properly to petitioner's allegations of discovery violations committed by the state. (Ground 3 (4)).

The Supreme Court determined in *Brady v. Maryland*, 373 U.S. 83 (1963) that the prosecution is required under the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady,* 373 U.S. at 87; *see also United States v. Bagley,* 473 U.S. 667, 674 (1985). *Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused," *Brady,* 373 U.S. at 87. *Bagley,* 473 U.S. at 675 & n.6-7. Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."

---

[5]Although this Court disagrees with the Ohio Court of Appeals's interpretation of the prosecutor's comments on petitioner's silence, this Court's interpretation does not further petitioner's claim.

*Id.* at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); s*ee also Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003), *cert. denied,* 125 S.Ct. 281 (2004). Evidence is deemed "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Bagley,* 473 U.S. at 676. Impeachment evidence is considered "evidence favorable to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence. *Id.*; *see also Giglio v. United States,* 405 U.S. 150, 153 (1972). On the other hand, evidence that tends to inculpate the defendant or that is neither facially exculpatory nor impeaching does not fall under *Brady*'s proscription. *United States v. Simpson,* 901 F.2d 1223, 1228 (5th Cir. 1990); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *cf. Agurs,* 427 U.S. at 112 n.20; *Phillip,* 948 F.2d at 250.

The *Brady* principles apply only to a complete failure to disclose exculpatory information. *United States v. Word,* 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied,* 480 U.S. 922 (1987); *United States v. Holloway,* 740 F.2d 1373, 1381 (6th Cir.), *cert. denied,* 469 U.S. 1021 (1984). Tardy disclosures of exculpatory evidence do not violate *Brady* unless the defendant has been prejudiced by the delay in disclosure. *Id.* If the disclosure is made "in time for full and adequate correction," no prejudice to the defense occurs. *Holloway,* 740 F.2d at 1381, quoting *United States v. Enright,* 579 F.2d 980, 989 (6th Cir. 1978).

Petitioner asserts that the prosecution's failure to inform him of a statement made by eyewitness Charlotte Riggs that petitioner had a tattoo violated his due process rights. The Ohio Court of Appeals concluded that the prosecution's failure during discovery to disclose a statement to police in which Ms. Riggs had indicated that the individual in the park whom she later identified as petitioner had a tattoo was not prejudicial because the trial court "permitted Neeley to demonstrate that he did not have a tattoo, and because there was also a stipulation that Neeley did not have a tattoo." (Doc. 4, Ex. 7 at 17).

Apparently, this information was provided belatedly to defense counsel who then cross-examined Ms. Riggs on this issue and had petitioner show that he does not have a tattoo. (Doc. 13, Tr. 716, 749). The parties also stipulated that petitioner does not have a tattoo. (Doc. 13, Tr. 922). The record is clear that petitioner does not have a tattoo, which raises doubts about Ms. Riggs identification of petitioner. Since defense counsel was able to use the information earlier withheld for impeachment purposes, petitioner was not prejudiced by the delayed disclosure. Accordingly, petitioner has not established a *Brady* violation.

As a second instance of a *Brady* violation, petitioner cites the failure of the prosecution to inform him that the police had retrieved the UDF videotape from the morning of May 28 to determine the veracity of petitioner's statement that he went there to purchase some cigarettes. The Ohio Court of Appeals determined that petitioner suffered no prejudice because he reviewed the videotape during trial and the trial court allowed him to call back the witness who testified about the tape, if he so desired. (Doc. 4, Ex. 7 at 18). When defense counsel complained that the state failed to provide him with the videotape, the trial court ordered it to do so. (Doc. 13, Tr. 990). The court gave defense counsel three days to review the tape and call the witness back. (Doc. 13, Tr. 990-991). Petitioner has not demonstrated that he was prejudiced by the tardy disclosure of the videotape.

Accordingly, the decision of the Ohio Court of Appeals denying petitioner's claims of prosecutorial misconduct during discovery was neither contrary to nor involved an unreasonable application of the Supreme Court's decision in *Brady* and was not unreasonable in light of the record evidence.

Moreover, petitioner has failed to demonstrate that the trial court failed to properly address the discovery violations. Petitioner was provided with the information about the tattoo in time to use it effectively at trial. When the trial court learned that the

prosecution had not furnished the store videotape, the judge ordered its production, allowing defense counsel three days to review it. Accordingly, petitioner is not entitled to relief with respect to his claim that the trial court deprived him of a fair trial by failing to respond to discovery violations, as alleged in ground three of the petition. Accordingly, the decision of the Ohio Court of Appeals rejecting this claim was neither contrary to nor involved an unreasonable application of Supreme Court caselaw and was not unreasonable in light of the record evidence.

### C. Prosecutorial Misconduct during Opening Statement concerning Petitioner's Kentucky Conviction and the propriety of the trial court's ruling on the admission of that conviction.

In his second ground for relief, petitioner asserts that the prosecution's comments about a prior criminal conviction during opening statements and before the trial court had ruled on his motion *in limine* with regard to that conviction violated his right to a fair trial. (Ground 2 (6)). In a related claim in petitioner's third ground for relief, petitioner argues that the trial court erred by declining to rule on petitioner's motion *in limine* initially and by failing to limit evidence and comments to the status of the conviction instead of the underlying facts. (Ground 3 (1)).

Over defense counsel's objection, the prosecution stated that "in 1993 David Neeley went on trial in Jackson County, Kentucky for shooting another man with a shotgun." (Doc. 13, Tr. 346). When the Court overruled the objection, the prosecutor continued to explain that petitioner was convicted and sentenced to ten years in prison. (*Id.,* Tr. 347).

The Ohio Court of Appeals found that the trial court had deferred ruling on petitioner's motion *in limine* until the evidence of the prior conviction was proffered at trial. (Doc. 4, Ex. 7 at 24). At that time, the trial court would determine if the evidence showed motive, identity, intent or was admissible for other permissible purposes. (*Id.*).

The Ohio Court of Appeals further found:

Here, the identity of the perpetrator of the crime and the perpetrators' motive and intent were in issue. The state offered the evidence relating to Neeley's pending charges in Clermont County for reckless driving,

aggravated menacing, and domestic violence in order to establish that Neeley had planned to murder Smith in order to prevent her from testifying at his hearing on June 1, 1994. Further, the state offered the evidence of Neeley's prior assault conviction in Kentucky to demonstrate motive on the basis that Neeley faced serving his suspended sentence in Kentucky if he was convicted of any of the Clermont County charges.

Having reviewed the record, we conclude that the challenged evidence properly related to motive, intent, identity, and preparation. Under the circumstances, that evidence was not unduly prejudicial, particularly where the court issued limiting instructions both during the trial and in its final charge to the jury. Specifically, the court instructed the jury to consider the evidence relating to prior "bad acts" only for purpose of deciding whether it proved, the absence of mistake, motive, opportunity, intent or purpose.

(Doc. 4, Ex. 7 at 24-25).

The rule against using evidence of other crimes to infer bad character or propensity to commit the charged offense "is so deeply embedded in our jurisprudence as to assume *almost* constitutional proportions." *Garceau v. Woodford,* 275 F.3d 769, 775 n.3 (9th Cir. 2001) (quoting Fed. R. Evid. 404(a), advisory committee note (1972)) (emphasis added), *judgment vacated on other grounds,* 538 U.S. 202 (2003); *see also Sims v. Stinson,* 101 F.Supp.2d 187, 196-97 (S.D.N.Y. 2000) (and cases cited therein), *aff'd,* 8 Fed. Appx. 14, 2001 WL 303750 (2nd Cir. Mar. 28, 2001). The United States Supreme Court explained the basis for excluding propensity evidence under the common law as follows:

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and

> deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States,* 335 U.S. 469, 475-76 (1948); *see also Old Chief v. United States,* 519 U.S. 172, 181 (1997) ("Generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged" constitutes "unfair prejudice" under Fed. R. Evid. 403). Although such evidence has the potential for prejudice, it is generally not excluded when it is particularly probative in showing intent, an element of the crime, identity, malice, motive, a system of criminal activity or when the defendant has raised the issue of character or has testified and the State impeaches him.[6] *Spencer v. Texas,* 385 U.S. 554, 560-61 (1967). The possibility of prejudice is outweighed by the validity of the State's purpose. *Id.* at 561. The defendant's interests are protected by limiting instructions and the trial judge's discretion to exclude particularly prejudicial evidence despite its admissibility. *Id.*

The Supreme Court has refused to express an opinion on the question whether a state law would violate the Fourteenth Amendment's Due Process Clause if it permitted the use of "prior crimes" evidence to show propensity to commit a charged crime. *See Estelle v. McGuire,* 502 U.S. 62, 75 n.5 (1991); *see generally United States v. Castillo,*

---

[6]Evid.R. 404(B) of the Ohio Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Rule of Evidence is codified in Section 2945.59 of the Ohio Revised Code, which provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

41

140 F.3d 874, 880 (10th Cir. 1998); *Klueger v. Lavigne*, No. 00-10410-BC, 2004 WL 45522, at *4 (E.D. Mich. Jan. 6, 2004) (citing *Dowling v. United States,* 493 U.S. 342, 352-53 (1990)).   Moreover, to date, the Supreme Court has not decided whether the admission of prior acts for permissible purposes without a limiting instruction violates due process.  *Garceau,* 275 F.3d at 774-75.  However, there are a few Supreme Court cases that provide guidance to state courts in adjudicating fair trial claims stemming from the admission of "other acts" evidence.

In *Spencer*, the Supreme Court ruled that admission of prior conviction evidence did not run afoul of the Due Process Clause  when limiting instructions were given and the valid state purpose of enforcement of a habitual offender statute was served. *Spencer,* 385 U.S. at 563; *see also Marshall v. Lonberger,* 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*). The *Spencer* Court noted that in joint trials, i.e., when several co-defendants are jointly tried or when one defendant is charged with multiple offenses in one trial, evidence submitted on one crime may influence the jury on a different charge. *Spencer,* 385 U.S. at 562.  Yet, the joinder procedure is justified because "the jury is expected to follow instructions in limiting this evidence to its proper function" and because of the convenience of a single trial.  *Id.*  The *Spencer* Court pointed out that in *Michelson,* which did not involve a constitutional claim, the Court approved of the government's cross-examination of a defense witness about the defendant's prior conviction because "limiting instructions on this subject are no more difficult to comprehend or apply than those upon various other subjects." *Id.* at 563 (quoting *Michelson,* 335 U.S. at 485).

In *Estelle,* the Supreme Court denied habeas corpus relief and held that the Due Process Clause was not offended by the admission of evidence of prior injuries to an infant for the purpose of proving an element of second degree murder, specifically, that defendant's killing of his infant daughter was an intentional act and not an accident. *Estelle,* 502 U.S. at 68-70.  The Court rejected the petitioner's claim that the trial court's jury instruction regarding the proper use of the injury evidence, *see* 502 U.S. at 67 n.1, could reasonably likely be misinterpreted by the jury as authorizing the use of propensity evidence; the Court reasoned that the trial court guarded against such misuse of the evidence by specifically advising the jury that the evidence could not be considered to prove that defendant "is a person of bad character or that he has a disposition to commit crimes."  *Id.* at 74-75.

In *Dowling v. United States,* 493 U.S. 342 (1990), a federal prisoner was convicted of robbing a bank, while wearing a ski mask and carrying a small pistol.  At

his trial, the government introduced evidence that defendant, similarly masked and armed, had entered a home approximately two weeks after the bank robbery.[7] *Id.* at 344-45. The government stated that it introduced this evidence for purposes of strengthening the identification of the defendant as the bank robber. *Id.* at 345. The Third Circuit ruled the evidence was inadmissible under Fed. R. Evid. 403 and 404, but that the error was harmless under the less stringent harmless-error standard than that established in *Chapman v. California,* 386 U.S. 18 (1967), for constitutional errors given that the district court's "mistake was merely evidentiary and not of constitutional dimension." *Id.* at 346-47. The Supreme Court, faced with the question whether the admission of the other acts testimony offended the Constitution and therefore required application of the more stringent *Chapman* harmless-error standard, affirmed the Third Circuit's decision; the Court held the introduction of the testimony did not offend the due process test of "fundamental fairness," in significant part because of the limiting instructions provided by the judge and of the fact that the testimony "was at least circumstantially valuable in proving petitioner's guilt." *Id.* at 352-53.

In this case, the trial court admitted evidence of the Kentucky assault conviction because the trial court believed that it was relevant to the issue of motive. (Doc. 13, Tr. 1055-1056). The state introduced the judgment including the jury's sentence recommendation and the appellate bond. (Doc. 13, Tr. 1061-1062, 1065). The prosecution further presented the testimony of a former Kentucky prosecutor who stated that if he had known that petitioner was charged or convicted of domestic abuse he would have moved to have petitioner's appellate bond revoked and petitioner would have then served his Kentucky sentence. (Doc. 13, Tr. 1064). In the state's view, petitioner's motive in killing Ms. Smith was to prevent her from securing a conviction against him in Clermont County and thereby causing him to serve his Kentucky sentence. Assuming the conviction was properly admitted, this Court agrees with Judge Painter's dissent that the underlying facts of the conviction, i.e., that petitioner shot another man with a shotgun, were not relevant to the issue of motive.[8] (Doc. 4, Ex. 7 at 32). Accordingly, this Court finds that the prosecutor's remark to this effect during

---

[7]The witness homeowner testified that she struggled with and unmasked the intruder, whom she identified as the defendant in the bank robbery trial. 493 U.S. at 344-45. Although petitioner was charged with burglary and other offenses based on the home intrusion incident, he had been acquitted of those charges prior to the federal bank robbery trial. *Id.* at 345.

[8]Judge Painter points out that the majority decision did not address the propriety of the prosecutor's comment during opening statement. (Doc. 4, Ex. 7 at 32).

opening statement was improper.

In weighing the relevant factors to be considered in determining the presence of a due process violation caused by prosecutorial misconduct, the Court finds two factors that weigh in petitioner's favor. The factors which favor petitioner's claim are that the comment was deliberate, and was objected to by the defense. The factors which weigh against petitioner's claim are the isolated nature of this comment, the comment did not mislead the jury or misstate the evidence, the sufficiency of the evidence, and the two types of instructions provided by the trial court. Both at the time of the comment and as part of the jury charge, the judge stated that the verdict was to be based on the evidence and that counsel's opening statement is not evidence. (Doc. 13, Tr. 347, 1333). In addition, at the time of the comment, before the Kentucky prosecutor testified and during the jury charge, the trial court admonished the jury that evidence of other bad acts could only be used for certain purposes, such as motive, and not to demonstrate propensity. (Doc. 13, Tr. 347, 1058, 1345-1346).

Although this Court acknowledges that the prosecutor's remark was inflammatory and prejudicial, this Court is also persuaded that it did not have a major effect on the verdict. *See Brecht*, 507 U.S. at 637. What brought about a conviction in this case was petitioner's own threats and criminal behavior toward the victim in the month preceding her murder. Accordingly, petitioner has not demonstrated that he is entitled to habeas corpus relief with respect to this prosecutorial misconduct claim.[9]

The trial judge's decision to withhold ruling on the motion *in limine* until trial does not raise constitutional concerns. Judges often defer ruling on such motions until trial to give them a better understanding as to how the particular bad act evidence fits in with the other evidence introduced at trial. *See, e.g.*, *United States v. Barbara,* No. 90-5537, 1992 WL 14600, at **3 (4th Cir. Jan. 31, 1992). Petitioner's claim that the trial court failed to limit the evidence of the felony assault to the status of that case as opposed to the underlying facts is equally unavailing. Petitioner fails to point to any evidence on the record which elaborates on the facts underlying the assault conviction.

With respect to the propriety of the trial court's admission of evidence relating to the prior felony assault conviction, this Court has some reservations. The state's

---

[9]Because the Ohio Court of Appeals did not address this specific claim, i.e., the propriety of the prosecutor's comment that petitioner shot another man with a shotgun, this Court does not apply the AEDPA's deferential standard of review, and instead independently evaluates the claim.

theory was that petitioner killed Ms. Smith because he thought her testimony in the Clermont County case would lead to a conviction and thereby contribute to his return to prison to serve the Kentucky sentence. The Ohio Court of Appeals found that the prosecutor's testimony demonstrated motive and was properly admitted for that purpose. While the testimony of the Kentucky prosecutor did not entirely support the state's theory because he said that the conviction or the *charges* in the Clermont County case would have caused the revocation of the appellate bond, and the charges were already in place before the murder, the determination by the Ohio Court of Appeals did not amount to an unreasonable determination of the facts. However, even if this Court were to assume that the trial court erred by admitting the evidence relating to the felony assault conviction for the purpose of establishing motive, this Court could not conclude that the state appellate court's determination was contrary to or an unreasonable application of Supreme Court precedent because the Supreme Court has declined to hold that "bad acts" evidence is so extremely unfair that its admission violates due process. *See Hamilton v. McLemore,* No. 01-10121-BC, 2004 WL 1765483 at *7 (E.D. Mich. July 9, 2004). In any event, relief on collateral review for the admission of prior bad act evidence is only appropriate when the trial error had "substantial and injurious effect or influence in determining the jury's verdict." *Ford v. Curtis,* 277 F.3d 806, 809 (6th Cir.)(citing *Brecht,* 507 U.S. at 637), *cert. denied,* 537 U.S. 846 (2002) . Although evidence of the prior assault or the prosecutor's comments about petitioner shooting a man likely prejudiced the jury against petitioner, petitioner has not persuaded this Court that the prior conviction evidence impacted the verdict in a substantial way. The trial court's admonition forbidding use of bad act evidence to show propensity helped ensure a just result. Moreover, the total evidence introduced against petitioner was not overwhelming, but was sufficiently strong to suggest that petitioner would have been convicted in any event. As noted, evidence of petitioner's threats and hostile actions towards the victim in the days and weeks before her murder and evidence of his presence at the scene were likely the determining factors leading to his conviction. Accordingly, petitioner is not entitled to habeas corpus relief with respect to his claim challenging the admission of evidence relating to his assault conviction in Kentucky, as asserted in ground three of the petition.

**III. Petitioner is not entitled to habeas corpus relief with respect to his claims that the trial court's rulings deprived him of a fair trial, asserted in his third ground for relief.**

**A. Admission of Domestic Violence Evidence**

In his third ground for relief, petitioner asserts that the trial court deprived him of a fair trial by admitting evidence of domestic abuse committed by petitioner against the victim.  (Ground 3 (2)).

The Ohio Court of Appeals found that the state offered evidence of the pending charges in Clermont County for reckless driving, aggravated menacing, and domestic violence to demonstrate that petitioner had perpetrated the murder to prevent Ms. Smith from testifying against him.  (Doc. 4, Ex. 7 at 24-25).  The appellate court concluded that the admission of the evidence was proper because it related to petitioner's motive, intent, identity and preparation and was not unduly prejudicial because the court issued instructions limiting consideration of the evidence for these purposes only.  (Doc. 4, Ex. 7 at 25).

In *State v. Nields,* 752 N.E.2d 859 (Ohio 2001), the prosecutor elicited testimony from a police officer who had responded to a domestic violence call concerning the defendant and the victim a few weeks before her murder. The Supreme Court of Ohio upheld the trial court's admission of the prior bad act evidence, explaining:

> Here, the evidence defendant complains about tended to show his motive to murder Newsome. See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus. The evidence also illustrated the tumultuous relationship between defendant and Newsome in an incident that took place just weeks before the murder. It also tended to prove the absence of accident and was evidence suggesting intent. The evidence showed defendant's strained relationship with Newsome within a month of the murder. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 390, 659 N.E.2d 292, 303.

752 N.E.2d at 882; *see State v. Thompson,* No. 81322, 2003 WL 21710623, at *3-4 (Ohio Ct. App. July 24, 2003), *appeal not allowed,* 798 N.E.2d 1094 (Ohio 2003).  Ohio courts have also approved of the use of evidence of acts of domestic violence to prove the identity of the perpetrator of the charged offense, when the prior acts occurred close in time to that offense and defendant denies being the perpetrator.  *See Thompson,* 2003 WL 21710623, at *3-4; *State v. Griffin,* No. C-020084, 2003 WL 21414664, at *4 (Ohio Ct. App. June 20, 2003) (evidence that defendant physically assaulted or threatened to kill his wife weeks before her death admissible to establish identity of shooter), *appeal not allowed,* 797 N.E.2d 512 (Ohio 2003); *State v. Newcomb,* No. 8-01-07, 2001 WL 1504260, at *3 (Ohio Ct. App. Nov. 27, 2001), *appeal not allowed,* 763 N.E.2d 1186

(Ohio 2002); *State v. King,* No. 13-97-12, 1997 WL 722778, at *3-4 (Ohio Ct. App. Nov. 10, 1997).

At trial, the state introduced evidence of the charges pending against petitioner (*see* Doc. 13, Tr. 421, 457), as well as the incidents which led to these charges. Specifically, the state introduced evidence of petitioner's actions on May 1, 1994 when he drove recklessly through the trailer park where Ms. Smith lived with her sister's family, argued with her, and then refused to leave. *See* page 19, *supra.* In addition, the state introduced evidence concerning an incident on May 2, 1994, when petitioner slammed his car into the victim's during a car chase. *Id.*

Before Mr. Watkins testified about the incident of May 2, 1994, the Court instructed the jury that evidence of other acts is "not admissible to prove the character of the person in order to show that he or she acted in conformity therewith." (Doc. 13, Tr. 371). The trial court further advised the jury that such evidence may be admissible for the purpose of showing "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (*Id.*, Tr. 372). The trial court issued a substantially similar instruction during the jury charge. (Doc. 13, Tr. 1345-1346). In addition, during closing argument both defense counsel and the prosecutor cautioned the jury against using petitioner's bad acts as evidence of his guilt . (Doc. 13, Tr. 1285, 1291, 1322-1323).

The evidence concerning the Clermont County charges was relevant to petitioner's motive to commit the crime, specifically to prevent Ms. Smith from testifying against him. That this was a concern for petitioner was evident from his threats to Ms. Smith in the month preceding her death. (Doc. 13, Tr. 477, 535). The evidence describing petitioner's violent behavior was relevant to the issue of identity and intent. Through his aggressive behavior petitioner demonstrated his desire to harm Ms. Smith. His hostile actions against her in the weeks before the murder lend credence to the state's position that petitioner and not some other person was involved in her murder.

Since evidence of domestic violence was admitted for a proper purpose and the Court admonished the jury to use it only for that purpose, petitioner has failed to demonstrate that he was deprived of a fair trial by the introduction of such evidence. Accordingly, the Ohio appellate courts' decision overruling petitioner's claim of error challenging the admission of evidence of domestic violence is neither contrary to nor involves an unreasonable application of the Supreme Court cases addressing propensity evidence and is not based on an unreasonable determination of the facts in light of the

record evidence.

## B. Admission of Opinion Testimony

Petitioner argues that the admission of police testimony that there were no other suspects violated his right to a fair trial. (Ground 3 (3)). He argues that such testimony implies that the officer believes that petitioner is guilty and carries undue weight because the jury may assume that the police have additional information which the jury has not seen. (Doc. 4, Ex. 5 at 24-25). Detective Patrick testified as follows:

Q. Okay. Now during your investigation did you also interview Judy Smith's first husband?

A. Yes.

Q. That's father of Mandy Smith?

A. Danny Smith.

Q. Did you talk to him?

A. Yes.

Q. Was he cleared as a suspect?

A. Yes.

[DEFENSE COUNSEL:] Objection as to conclusion.

THE COURT: Sustained. Strike.

Q. In your investigation were you able to uncover anybody other than that man right there, that was an enemy to Judy Smith?

[DEFENSE COUNSEL:] Objection. Move for mistrial. Ask that it be stricken.

THE COURT: Strike.

48

Q.  Did you find out any enemies of Judy Smith at all?  Anybody that –

THE COURT: In his opinion.

Q.  – in your opinion would be considered an enemy of Judy Smith.

A.  No, sir.

(Doc. 13, Tr. 986).

After sustaining two objections and striking the testimony about other suspects, the trial court permitted Detective Patrick to answer the question about whether he had uncovered any enemies of Ms. Smith.  (Doc. 13, Tr. 986). The Ohio Court of Appeals determined that the actions of the trial court in sustaining the objections and striking the testimony about other suspects remedied the alleged error. (Doc. 4, Ex. 7 at 22).  The Ohio Court of Appeals further determined that the detective's comment about other enemies was properly admitted under Ohio Evid. R. 701 governing opinion testimony by lay witnesses which requires that the testimony be based upon perceptions and be helpful to an understanding of the testimony or a fact in issue.  (Doc. 4, Ex. 7 at 22).  The appellate court concluded that the testimony was based on Detective Patrick's perceptions and investigation into Ms. Smith's murder and was helpful to an understanding of petitioner's motive and intent.  (*Id.*).

A federal court may issue a writ of habeas corpus on the ground that petitioner's confinement violates the Constitution, laws or treaties of the United States, 28 U.S.C. § 2254(a), but not "on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41 (1984).  A state court ruling on the admission or exclusion of evidence is not open to challenge on federal habeas corpus review unless it rendered the trial so fundamentally unfair as to amount to a denial of due process.  *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1354 (6th Cir. 1993), *cert. denied,* 510 U.S. 1201 (1994) (and cases cited therein); *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983).

The admission of Detective Patrick's testimony that his investigation did not uncover any enemies of Ms. Smith did not render petitioner's trial fundamentally

unfair.[10] During the opening statement and cross-examination of the state's witnesses, defense counsel suggested that there were other suspects whom the police failed to pursue.  (*See* Doc. 14, Tr. 367, 401, 490, 500, 507, 514, 529-530, 542, 610-631, 1029, 1295-1296).  Counsel implied that police prematurely and unfairly focused their investigation on petitioner.  (Doc. 14, Tr. 367, 1029-1030,1034,1039, 1160-1161).  Detective Patrick's testimony that he could not uncover anyone who could be considered an enemy of the victim explained the reason for the police's failure to investigate aggressively other individuals and instead emphasize petitioner.

Accordingly, petitioner is not entitled to habeas corpus relief with respect to ground 3 (3) of the petition.

### B.  Admission of Photographs of the Body and Showing of Videotape of the Body

In his third ground for relief, petitioner alleges that the trial court deprived him of due process by admitting gruesome photographs of the victim's body and permitting the jury to view a videotape of the victim's body.  (Ground 3 (5)).

In *Thompson v. Oklahoma,* 487 U.S. 815 (1988), Justice Scalia in his dissenting opinion, reached the question of whether the Constitution was violated when the jury viewed color photographs of the murder victim's body, showing gunshot wounds, and knife slashes. [11] 487 U.S. at 878.  Noting that the photographs were probative on one of the aggravating circumstances, the justice indicated that the only remaining issue was whether they were unduly inflammatory.  *Id.*  He explained:

We have never before held that the excessively inflammatory character of concededly relevant evidence can form the basis for a constitutional attack,

---

[10]Because the Ohio Court of Appeals analyzed this claim under state law and did not address it as a constitutional issue, this Court does not apply the AEDPA's deferential standard of review, and instead independently evaluates the claim. However, had this Court applied the AEDPA standard to the ultimate ruling of the state appellate court, this Court would not have granted habeas corpus relief to petitioner.

[11]The majority held that the Constitution prohibited the execution of a defendant who was fifteen years old at the time the murder was committed.  Justice Scalia who believed that the defendant's age was an inadequate ground to vacate his sentence, reached the additional issue concerning the photographs.

and I would decline to do so in this case.  If there is a point at which inflammatoriness so plainly exceeds evidentiary worth as to violate the federal Constitution, it has not been reached here.  The balancing of relevance and prejudice is generally a state evidentiary issue, which we do not sit to review.  *Lisenba v. California,* 314 U.S. 219, 227-228, 62 S.Ct. 280, 285-286, 86 L.Ed. 166 (1941).

*Id.*  As noted, it is well established that state court rulings concerning the admissibility of evidence are generally not cognizable on habeas corpus review unless "they offend . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Patterson v. New York,* 432 U.S. 197, 202 (1977) (citations omitted).  Accordingly, this court's habeas review is under the due process test of fundamental fairness, not the evidentiary standard of weighing the probative versus the prejudicial effect of such evidence.  *See Dowling,* 493 U.S. at 353; *Patterson,* 432 U.S. at 201-202; *Serra,* 4 F.3d at 1354 (and cases cited therein); *Cooper v. Sowders,* 837 F.2d at 286; *Walker,* 703 F.2d at 962; *Givens v. Yukins*, 2000 WL 1828484, at **4-**5.

The Ohio Court of Appeals rejected petitioner's claim challenging admission of the photographs and the viewing of the videotape as follows:

Pursuant to Evid.R. 403, a trial court must reject an otherwise admissible photograph where its probative value is substantially outweighed by the danger of unfair prejudice, and the trial court may reject an otherwise admissible photograph where its probative value is substantially outweighed by its cumulative nature or by considerations of undue delay. . . . [B]efore admitting the photographs, the trial court had to determine whether the danger of prejudicial impact substantially outweighed the probative value of the photographs, and whether the photographs were repetitive or cumulative in nature.

Neeley argues that the trial court erred in admitting the photographs of the victim, particularly the "maggot-ridden remains of the face of the victim."  According to Neeley, these photographs were repetitive, gruesome, and inflammatory.  While the photographs (seven of which were taken at Millcrest Park and seven of which were taken at the morgue) were admittedly gruesome, they were not *per se* inadmissible.  The photographs depicted the location where Smith was found, the placement of Smith's body at that location, the location of the wounds causing her death, and the

defensive wounds on her hands.  The photographs were helpful in illustrating the testimony of the police officers, the coroner, and the witness who found Smith's body at the park.  Moreover, the photographs were probative of the fact that Smith had been moved from the location where she was murdered and of Neeley's purpose to cause death.  In sum, the probative value of the photographs substantially outweighed the danger of prejudice to Neeley, and they were not repetitive or cumulative in nature. Accordingly, we find no abuse of discretion in the trial court's decision to admit the photographs into evidence.

Similarly, we are unpersuaded that Neeley was prejudiced when the jury was allowed to view a videotape that was not admitted into evidence, because the videotape, like the photographs, depicted where and how Smith's body was found at Millcrest park and the extent of her injuries.

(Doc. 4, Ex. 7 at 19-20) [citations omitted].

The record supports the Ohio appellate court's findings that the photographs were used to illustrate the testimony of  Detective Alderucci (Doc. 13, Tr. 843-846), the coroner (Doc. Tr. 38-41) and the little girl who found the victim (Doc. 13, Tr. 779), as the witnesses explained the scene where the victim was discovered, and her condition including the various locations of her wounds.  As the Ohio appellate court found, the forty stab wounds depicted were  evidence of the perpetrator's purposeful intent.  In addition, this Court believes that the numerous stab wounds are relevant to another element of the offense--prior calculation and design. Although the videotape was shown to the jury, the state withdrew it from evidence when the judge suggested that it was redundant.  (Doc. 13, Tr. 1172).  Later the judge admonished the jury that exhibits not introduced into evidence are not be considered in their deliberations. (Doc. 13, Tr. 1333-1334).   Moreover, petitioner does not allege and the record does not reveal that the prosecutor referred to these photographs or the videotape in an inflammatory manner and in fact, the prosecutor did not mention either in his closing argument.

Under the circumstances of this case,  the admission of the photographs and the viewing of the videotape did not render the trial fundamentally unfair because they were

not used for illegitimate purposes.[12] The photographs were part of the prosecution's proof of the intent and prior calculation and design elements of the crime and illustrative of the testimony of the state's witnesses. *Cf. Givens,* 2000 WL 1828484 at **5 and cases cited therein; *Garrett v. Parke,* No. 89-5180, 1989 WL 153553, at *1 (6th Cir. Dec. 20, 1989); *Pearl v. Cason,* No. CIV.A.01-CV-73051-DT, 2002 WL 31008106, at *8-9 (E.D. Mich. Aug. 13, 2002), *aff'd* 86 Fed.Appx. 858, 2004 WL 162544 (6th Cir. Jan. 23, 2004), *petition for cert. filed,* No. 04-6120 (U.S. June 21, 2004) ; *Jackson v. Anderson,* 141 F.Supp.2d 811, 840 (N.D. Ohio 2001) (admission of series of gruesome photographs of victim's body which illustrated the coroner's testimony concerning the nature and extent of the victim's injuries, the number of blows and the type of forced used, and helped to establish assailant's intent did not deprive petitioner of fundamentally fair trial); *Frazier v. Mitchell,* 188 F.Supp.2d 798, 833-834 (N.D. Ohio 2001) (admission of twenty-five photographs of victim's "butchered body" relevant to numerous issues in case did not violate due process), *rev'd in part on other grounds,* 343 F.3d 780 (6th Cir.), *opinion supplemented,* 348 F.3d 174 (6th Cir. 2003), *cert. denied,* 124 S.Ct. 2815 (2004). The state appellate court found that the videotape was helpful in depicting the victim's wounds. Nevertheless, the jury was indirectly admonished not to consider the videotape in that it was not admitted into evidence. Accordingly, petitioner has not demonstrated that he is entitled to relief with respect to his claim challenging the admission of photographs and the showing of the video of the body, asserted in ground three of the petition.

## C. Other evidentiary rulings

As part of his third ground for relief, petitioner asserts the following catch-all claim:

> The court allowed other [sic] several other items of evidence and testimony that were improper, and that, when considered cumulatively with the other errors, operated to deny the defendant a fair trial.

---

[12]Because the Ohio Court of Appeals analyzed this claim under state law and did not address it as a constitutional issue, this Court does not apply the AEDPA's deferential standard of review, and instead independently evaluates the claim. However, had the Court applied the AEDPA standard to the ultimate ruling of the state appellate court on the admissibility of the photographs and the viewing of the videotape, this Court would not have granted habeas corpus relief to petitioner.

(Doc. 1, Para. 12, Ground 3 (6)). In his return of writ, respondent argues that "without further explication (and indeed an amendment to the petition)" a response is not necessary and urges the Court to decline "Neeley's invitation for a fishing expedition." (Doc. 4 at 24). Although petitioner filed a traverse, he failed to elaborate on this claim.

In a habeas corpus proceeding, it is the petitioner who has the burden of proving a violation of his constitutional rights. *See, e.g., Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir. 1988). Rule 2(c) of the Rules Governing Habeas Corpus cases under Section 2254 requires that the petition "set forth in summary form the facts supporting each of the grounds thus specified." Conclusory allegations warrant dismissal of the claim. *Anderson v. Pennsylvania Attorney General,* 82 Fed.Appx. 745, 749-750, 2003 WL 22956022, at **4 (3rd Cir. Nov. 12, 2003); *Burgess v. Cook,* 75 Fed.Appx. 581, 2003 WL 22039792, at **1 (9th Cir. August 28, 2003); *Gardner v. Norris,* 949 F.Supp. 1359, 1368 (E.D. Ark. 1996); *Deputy v. Taylor,* No. Civ. A. 93-387 LON, 1993 WL 643368, at *27-28 (D. Del. Aug. 17, 1993), *aff'd,* 19 F.3d 1485 (3rd Cir.), *cert. denied,* 512 U.S. 1230 (1994)..

Over three decades ago, the United States Court of Appeals for the First Circuit elaborated on the specificity required in a habeas corpus petition:

> This petition for habeas corpus relief presents a question which is arising with increasing frequency, whether a defendant whose attack on his state conviction has been reviewed by the state courts is entitled to further review in the federal system simply for the asking. We hold he is not. The fundamental purpose of habeas would be undermined if the writ were prostituted by holding it out as available upon mere 'notice' or token pleading, without any showing of entitlement. We do not accept the burden, upon ourselves and other litigants alike, that would follow if state defendants, simply by making conclusory allegations, could require district judges–and inevitably, on appeal, three circuit judges–to read the records and transcripts of their state trials. Habeas corpus is a special proceeding to right wrongs, not a routine procedure to search for them, nor a means of requiring the federal courts to review, as a matter of course, state proceedings.

*Bernier v. Moore,* 441 F.2d 395, 396 (1st Cir. 1971).

Because petitioner's final claim in his third ground for relief fails to specify which

evidentiary rulings were improper and why, petitioner has failed to plead his case properly. This Court is not required to cull from the state court record every possible ruling of the state trial court and then address the propriety of the ruling. Nor is it the responsibility of this Court to guess which of the claims raised in his state court brief petitioner wishes to pursue on habeas corpus review. *Cf. Anderson,* 82 Fed.Appx. 745, 750, 2003 WL 22956022, at **4. While the federal court affords *pro se* litigants a liberal construction of their filings, in this case, petitioner is represented by an attorney and therefore is not granted the same leniency in pleading.

Accordingly, petitioner has not established that he is entitled to habeas corpus relief with respect to his generic claim challenging the evidentiary rulings of the trial court, as asserted in ground three of the petition.

**IV.  Petitioner is not entitled to habeas corpus relief based on his claim that cumulative errors at trial deprived him of due process of law, asserted in ground four of the petition.**

As his fourth ground for relief, petitioner argues that the cumulative effect of the errors identified in his grounds for relief  rendered his trial fundamentally unfair and deprived him of due process of law.

The Ohio Court of Appeals explained its rejection of petitioner's cumulative error claim, as follows:  "Because we have rejected Neeley's twelve other assignments of error, there is no cumulative error to recognize in this case."  (Doc. 4, Ex. 7 at 30).

"The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.), *corrected on other grounds on denial of petition for rehearing,* 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003)), *cert. denied,* 537 U.S. 1192 (2003).  As a result, cumulative error is not a basis for granting habeas corpus relief in non-capital cases. *Davis v. Burt,* 100 Fed.Appx. 340, *351, 2004 WL 771224, at **9 (6th Cir. April 9, 2004); *Eskridge v. Konteh,* 88 FedAppx. 831, *836, 2004 WL 232150, at **4 (6th Cir. Feb. 3, 2004).

Accordingly, the decision of the Ohio Courts with respect to petitioner's claim of cumulative error was not contrary  to or an  unreasonable application of Supreme Court caselaw nor was it based on an unreasonable determination of the facts in light of the

evidence presented.  Petitioner is therefore not entitled to habeas corpus relief based on his claim of cumulative error, as alleged in ground four of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2. A certificate of appealability should issue with respect to the constitutional claims alleged in Ground One, Ground Two (1), (2), (3) and (6), Ground Three (1), (2), and (5) because reasonable jurists could debate whether these claims should have been resolved in a different manner and, alternatively, whether the issues presented in these grounds for relief are "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). A certificate of appealability should not issue with respect to the remaining claims, which have been addressed on the merits, because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore GRANT petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:   November 23, 2004                          s/Timothy S. Black
      hr                                      Timothy S. Black
                                           United States Magistrate Judge

J:\ROSENBEH\2254(2004)\02-520suf&prosmis.wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

David Lee Neeley,
    Petitioner


    vs                             Case No. 1:02cv520
                                         (Weber, J.; Black, M.J.)


Harry Russell,
    Respondent

---

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled action. Pursuant to Fed. R. Civ. P. 72(b), any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.  Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).